JACOB F. BROWN, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ALBERT S. HOWE, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HAROLD M. CUMMINGS, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SAMUEL G. ADAMS, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HARRY P. BRADFORD, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

EDMUND F. LELAND, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 16469–16474. Promulgated January 20, 1930.

*James Craig Peacock, Esq., C. E. Koss, Esq.,* and *John W. Townsend, Esq.,* for the petitioners.

*Philip M. Clark, Esq.,* and *C. C. Holmes, Esq.,* for the respondent.

STERNHAGEN: The petitioners in all these proceedings attack respondent's treatment of the partnership's wool profits for 1918. Their first point is that, since the Government through the War Industries Board and its successor, the Bureau of Markets, claimed and still claims the profits in excess of 5 per cent, the respondent can not consistently tax such profits as income of the partnership. This point can not be sustained. It is in effect based on an estoppel arising from a mere claim, right or wrong, of another division of the Government. Similar claims of the Government have been held to be unfounded, *McFarland* v. *United States*, 15 Fed. (2d) 823; *United States* v. *Avery*, 30 Fed. (2d) 728; *United States* v. *Smith*, 32 Fed. (2d) 901, and the persistence of the Government's claim against these petitioners does not establish that in fact or in law the profits were not income of the petitioners. The argument of estoppel operates equally against petitioners as for them, for are they not resisting the suit? Since they defend as owners of the profits, an argument of estoppel might, if available to either party here, serve to prevent them from denying that the income is taxable to them. But we regard the argument as unavailable to either party, the petitioners' right here depending not on their attitude or that of the Government but on whether the profits were legally their income. In accordance with the decisions already cited, we hold that they were, and that respondent was correct in so treating them notwithstanding the wool regulations. The decision in *Dayton-Goose Creek Ry. Co.* v. *United States*, 263 U. S. 456, cited by petitioners, is not in point. There a statute created a trust of the excess earnings, whereas here there is no statutory foundation for a trust, no claim has ever been made by the Government that one exists, and it has been judicially held that the regulations relied upon to support the Government's right to the profits were ineffective. *McFarland* v. *United States, supra.*

Our holding would be the same, even if full force were given to the wool regulations, for they in terms recognize rightful receipt of the profits by the partnership and purport only to control disposition thereafter. This would not prevent the profits from being within petitioners' gross income, leaving until actual disposition thereof any question of deduction. Cf. *Marion S. B. Lansill*, 17 B. T. A. 413. A mere constraint on their disposition by reason of a possible future contingency does not reduce either gross or net income. Cf. *W. J. Ostheimer*, 1 B. T. A. 18.

This also disposes of the argument of petitioners that the profits can not be taxed as accrued income until the outcome of the Govern-

ment's suit is known. Since the wool regulations have been without force to take from petitioners any part of their profits, or to impress them with a trust for the Government, such profits must be regarded as having accrued to petitioners irrespective of the regulations or the resulting litigation. As held in the *McFarland* and later cases, these petitioners were the rightful recipients of the profits and were not required to account for them, hold them, or dispose of them at the behest of the wool division, and it would be anomolous now to say that although they legally at once accrued to petitioners they may not be taxed at that time.

Petitioners urge that the respondent's determination is invalid because not definitive. The deficiency notices contain the following:

It has been held by this office that the amount of $275,345.12 included in the partnership returns in an account captioned "Whom It May Concern", was rightfully included therein pending a decision by the District Court of Boston.

This is in our opinion a final determination that a deficiency now exists. The words "pending a decision by the District Court of Boston" may lead the taxpayers to expect that at the time of the decision of the District Court consideration will be given to its effect upon their tax liability, but this does not make the present determination any less final under section 274, Revenue Act of 1926, so as to affect petitioners' right to proceed before the Board. A determination of deficiency sufficient to support a petition requires adjudication by the Board on the merits, and we can not say that there is no deficiency because of the quoted words appended to the statement of its determination.

The petitioners next attack the inclusion of $275,345.12 in gross income of 1918 on account of wool profits on the ground that a report of an examining revenue agent indicates an erroneous method of arriving at such amount. This is an attempt to create a false issue. The Board's function is to determine upon evidence of facts whether the deficiency is as determined by respondent. The presumption is with the respondent and the burden of proof by evidence of facts is upon the petitioner who attacks it. The respondent's result may be correct, as it is presumed to be, notwithstanding incorrect factors of computation or incorrect methods or hypotheses in arriving at such result. *Bishoff* v. *Commissioner*, 27 Fed. (2d) 91; *Helen P. Parker*, 14 B. T. A. 1185. The respondent has held that in respect of the 1918 clip petitioners, on the accrual system which they voluntarily employed and for the calendar year 1918 which they voluntarily chose for their fiscal year, realized $275,345.12 more income than they had returned. To succeed in setting this aside, petitioners must show that their true income in accordance with a correct use of the method of accounting regularly employed by them

under section 212 was less.  This is not adequately done by showing that in his recommendation to the Commissioner the auditing revenue agent has used a method of apportionment based on gross sales, or has failed to use an inventory as the petitioner would have preferred.  There is in the record insufficient evidence to establish that the agent's method of apportionment does not fairly reflect 1918 income or that an inventory was essential or even proper under section 203.

In the findings of fact is included a stipulated modification of the figure used in the Ringle account in the apportionment.  From this it can not be said, as petitioners contend in their brief, "that the alleged excess wool profits for 1918 in the amount of $275,345.12 should in any event be reduced by $4,186.78 to $271,158.44."  If the parties by their stipulation intended it to carry such a reduction, they may use it as they intended in the settlement under Rule 50.

Some question was made in a motion at the trial as to an alleged error of respondent in duplicating income by adding to gross income as profit an amount approximating $33,000 which is said already to have been included as interest.  The point is not pressed in petitioners' brief, although it is referred to in an appendix.  We think the evidence is insufficient to establish a duplication.  The original returns are not in evidence nor do the facts appear to show how the income originally returned was made up.  The evidence that petitioners' bookkeeping practice was such that interest was habitually recorded on outstanding accounts and that sales receipts were for accounting purposes classified partly as interest and partly as profit can not be translated into a finding of fact or conclusion of law that the deficiency determined by respondent includes a duplication in income of about $33,000 already accounted for.  Respondent denies this, and we think the petitioners have failed to prove it.

The petitioners' contention that not only the "excess" profits of $275,345.12 failed to accrue as income in 1918 but also that $229,605.56, already returned as income by petitioners, should be held as not yet accrued in 1918 is in our opinion not well founded.  It lacks support in law as well as in evidentiary fact.  Petitioners adopted of their own volition an accrual basis of accounting and a calendar year.  Notwithstanding this, they contend now that the profit on the "season's business" did not accrue as income until the clip was all sold in 1919.  We think the profits from sales made in 1918 may properly, under petitioners' method of accounting, be treated as 1918 income, *Wankinco Bog Co.*, 16 B. T. A. 386, and in the absence of evidence that such profits were in fact less than the amount recognized by respondent in his determination of deficiency, such determination is in this respect sustained.

An issue argued in petitioners' brief as to the Hillsborough Mills account can not be definitely ascertained from the pleadings and record of the trial. The point argued in brief is that the financing charges of $55,659.62 (after a concession by petitioners that $44,476.16 of an originally disputed amount of $100,135.78 is not open to attack) have been erroneously included by respondent in accrued income of 1918. This is predicated on an assumption of fact that the petitioners omitted any such amount from the return of gross income, that the examining revenue agent added the amount to gross income, and that the respondent adopted this and carried it into his determination of deficiency. But the issue is pleaded differently, being based upon an apparent error of respondent in interpreting petitioners' returns as if deduction had been made of bad debts on this account, which interpretation respondent in answer denies. The return is not in evidence, nor is it otherwise clear in evidence what is the foundation for the issue. The subject is expressly treated in the revenue agent's report, although with some equivocation as between a deduction of bad debts and an exclusion from gross income. The deficiency notice makes no direct reference to the subject, and we have no inclination to search it out independently. In this condition of the record, there would be reason to hold that no error in respondent's determination has been established.

We are of opinion however that on the merits of the issue as argued by petitioners' counsel, the decision must go against them on this point. From the only party to the financing transactions who testified, it appears that, although there was no written agreement that the Mills should pay the financing charges, it was always recognized that the charges were proper and earned. Bills were consistently rendered for them and not disputed. Account was taken of them by the partnership, notwithstanding that such account was specially kept and not reflected in the profit and loss statement or announced in reports for banking or other credit. The subsequent payment is evidence of a subsisting agreement throughout. Therefore we think that the financing charges were earned, and, under petitioners' method of accounting, accrued in 1918 as determined by respondent.

The petitioner Jacob F. Brown in Docket 16469 presents an issue in addition to those arising through the partnership and having no effect upon the other petitioners. He deducted $72,961.82, the cost of the Japanese bonds which had been sequestered by the German Government while being held for petitioner by the Deutsche Bank. The respondent apparently disallowed the deduction. It is not clear whether petitioner treats the deduction as that of a worthless claim

against the Deutsche Bank or as that of a loss of the bonds. The facts are undisputed so far as they go, and petitioner relies entirely on *United States* v. *S. S. White Dental Mfg. Co.*, 274 U. S. 398, as authoritatively supporting his right to the deduction.

The *White* case involved the sequestration by the German Government of all the assets of a corporation in Germany which was indebted to the taxpayer and the stock of which the taxpayer owned. The seizure of the assets in 1918 left nothing to the taxpayer but a claim of doubtful or remote effectiveness against Germany, then a belligerent nation at war with the United States. The court held that the stock and open accounts held by the taxpayer, all of which were entirely subject to German control, were in 1918 so unlikely to be recovered and that the claim was so remotely likely to succeed that the investment could reasonably be called a loss.

The situation of this petitioner was not quite the same. The value of these bonds rested ultimately not with Germany but with Japan. Their sequestration by Germany might conceivably be overcome by Japan's refusal to recognize it. But as a practical matter, petitioner's property had been taken from him and he was helpless to secure its return except, so far as he knew, by arduous, prolonged and uncertain means. The chances of recovery were little, if any, more favorable than those of the taxpayer in the *White* case, *supra*. Later when he recovered the bonds he treated them as income upon his return for the year of recovery. We are of opinion that respondent was not justified in disallowing the loss for 1918, and in this respect his determination as to this petitioner is reversed.

Reviewed by the Board.

*Judgment in each proceeding will be entered under Rule 50.*

----

MURDOCK, dissenting: I dissent from that part of the opinion in this case which holds that Jacob F. Brown sustained a loss of the cost of certain Japanese bonds. Such facts as are before us distinguish this case from the *White Dental* case relied upon by the petitioner. The petitioner was the creditor of Japan which, like our country, had been at war with Germany. At the end of 1918 when the loss was claimed to have been sustained the war was over. The bonds were payable in English sterling. Germany had sequestered the bonds but had never made any effort to do anything more than merely hold them. We have not been told of the terms or conditions of the bonds or of the attitude of Japan toward such bondholders as the petitioner. The Commissioner has held that the petitioner did not sustain any loss in the year 1918. On the showing made by the

petitioner I am not convinced that the Commissioner erred. Nor do I believe that the petitioner has shown that he was helpless to secure the return of his property. If, as a practical matter, he was helpless to secure the return of his property, he should have offered proof of such fact. Proof that the bonds were sequestered is not enough.

McMahon agrees with this dissent.

---

Green,[1] dissenting: While I am unable to agree with much that has been said in the majority opinion, I feel it necessary to express my views only as to the question of whether or not there should be included in the income of the petitioners, for the year 1918, any part of the excess profits from the season's business. This question is twofold; First, did the petitioners derive income, and second, when did they derive such income, if at all? It seems to me that as long as the Department of Agriculture, or any other branch of the Federal Government, continues to press its claim against the partnership of Brown & Adams, for the profits from the 1918 wool clip in excess of the 5 per cent provided for in the Government Wool Regulations, it is error for another Department of the same Government to propose to tax the partnership on such excess profits as if they were unqualifiedly the profits and property of the partnership. To sustain the respondent would be to place the Government in an inconsistent position. See *R. Hoe & Co.* v. *Commissioner*, 30 Fed. (2d) 630.

The income and profits taxes are levied on "net income," which Congress has defined as meaning "gross income as defined in section 213, less the deductions allowed by section 214." See sections 210 to 214, inclusive, and 320 (a) (3) of the Revenue Act of 1918. Section 212 further provides that "the net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer * * *," and section 200 provides in part that "the term 'paid,' for the purposes of the deductions and credits under this title, means 'paid or accrued' or 'paid or incurred,' and the terms 'paid or incurred' and 'paid or accrued' shall be construed according to the method of accounting upon the basis of which the net income is computed under section 212." In *Sanford & Brooks Co.*, 11 B. T. A. 452, we said, at page 458:

Under our system of Federal taxation, an accounting period for one year has been prescribed as the basis for reporting income for tax purposes, and each

---

[1] Report adopted and dissent filed during Mr. Green's term of office.

taxable period stands alone with items of income and deductions determined in the light of events and circumstances transpiring within that year.

The problem thus presented in the first issue is to determine whether upon the facts we have a question of " gross income " or a question of " deductions " and since the partnership kept its books and rendered its returns upon the accrual basis of accounting, whether the " gross income " or " deductions," as the case may be, " accrued " during the taxable year 1918.

The theory upon which the respondent supports his determination is not exactly clear. In his deficiency letters, he states that the excess profits in question were rightfully included in the income of the partnership for 1918 " pending a decision by the District Court of Boston." In other words, according to the statements made in the deficiency letters, if the final result of the litigation now pending before the District Court should be adverse to the partnership, the respondent would propose to exclude the excess profits in question from the income of the partnership for 1918. Such action in view of the fact that petitions have been filed with this Board and section 284(d) of the Revenue Act of 1926 could not be legally justified. In his brief, however, the respondent argues that the question is one of deductions from gross income and that the partnership is entitled to no deduction on account of the excess profits unless and until the case now pending before the District Court for the District of Massachusetts is finally decided or settled adversely to the petitioner, and cites *Malleable Iron Range Co.* v. *United States*, 62 Ct. Cls. 425; *Consolidated Tea Co.* v. *Bowers*, 19 Fed. (2d) 382; *Farmers National Bank of Rome*, 6 B. T. A. 1036; and *Frank J. Jewell*, 6 B. T. A. 1040. This last theory takes it for granted that all of the profits made in connection with the 1918 wool clip should be treated as the absolute property and hence the income of the partnership, notwithstanding the latter's agreement with the War Industries Board to abide by the Wool Regulations of that Board, which provided that all profits in excess of 5 per cent " shall be disposed of as the Government decides." It should first be determined whether such excess profits or any portion thereof are in fact and in law a part of the gross income of the partnership for the taxable year 1918.

The question is whether any portion of the excess profits " accrued " to the partnership as gross income during 1918.

In *Sowers Manufacturing Co.*, 16 B. T. A. 268, we said:

The general rule is that a taxpayer reporting on an accrual basis must report items of income at the time they accrue, without regard to the time they are paid. *Appeal of Schock*, 1 B. T. A. 528; *Appeal of Butler*, 1 B. T. A. 1105; and *Appeal of Harris*, 2 B. T. A. 933. A taxpayer who keeps its books

and reports its income on the accrual basis is not, however, required to report as income that which in all probability it may never receive. *Great Northern Railway Co.*, 8 B. T. A. 225, 265.

And in *Peninsula Shipbuilding Co.*, 9 B. T. A. 1189, we said at page 203:

* * * In numerous appeals the Board has held that disputed and contested claims not set up on the books of account of taxpayers are not accruable items of income or deductions therefrom until the year of actual settlement.

The facts and circumstances surrounding the excess profits at the close of 1918 may be summarized as follows: The partnership had entered into an agreement with the War Industries Board to abide by their regulations relative to the 1918 wool clip in consideration that the partnership be given a permit to act as a central wool dealer during the war. The profiteering clause of the regulations contained a provision that all profits " in excess of 5 per cent on the season's business * * * shall be disposed of as the Government decides." At no time during 1918 did the partnership question the validity of such regulations. It kept its accounts in accordance with the wool regulations and at the close of the season's business in 1919, it set up in a separate account, captioned " Whom it May Concern—War Industries Board Wool Regulations," what it believed to be the profits in excess of 5 per cent. Toward the close of 1919 the partnership still remained ready to turn over the excess profits to the Government for return to the growers, provided it be returned to the growers on some basis other than the pro rata basis. It·was not until the Government refused to use some basis other than the pro rata basis that the partnership ever questioned the validity of the Government's regulations or refused to pay over to the Government the excess profits in question. The War Industries Board and the Department of Agriculture have at all times contended that the partnership had no rights whatever in the 1918 wool profits in excess of the 5 per cent provided for in the regulations. In the suit which the United States has filed against the partners in the District Court of Boston and which suit is still pending, the United States is claiming the excess profits in question as its own.

Under the circumstances as set forth above, I do not think any part of the excess profits in question can be said to have accrued to the partnership as income during the year 1918. During that year, both the partnership and the War Industries Board considered such profits as the property of the Board and not the partnership. In *Sterling Coal Co., Ltd.*, 8 B. T. A. 549, at page 553, the Board said:

Taxes should be computed on an annual basis and on the basis of facts known or ascertainable during the taxable years.

The fact that the partnership had possession of such profits is not controlling. See *Frederick McLean Bugher et al.*, 9 B. T. A. 1155,

and *Ansco Photo Products, Inc.* v. *Clark*, 34 Fed. (2d) 568, decided June 20, 1929.

A somewhat similar situation exists in connection with the proper treatment for income-tax purposes of the liability for "recapture" amounts as determined by the Interstate Commerce Commission in accordance with the provisions of section 15 (a) (6) of the Interstate Commerce Act, as amended by the Transportation Act (41 Stat. 489) which provides in part as follows:

If, under the provisions of this section, any carrier receives for any year a net railway operating income *in excess of 6 per centum of the value of the railway property* held for and used by it in the service of transportation, one-half of such excess shall be placed in a reserve fund established and maintained by such carrier, *and the remaining one-half thereof shall*, within the first four months following the close of the period for which such computation is made, *be recoverable by and paid to the commission* for the purpose of establishing and maintaining a general railroad contingent fund as hereinafter described. * * * (Italics ours.)

At the time the petitions here under consideration were filed, the rulings of the respondent provided that all of the operating income of the railroads in excess of 6 per cent should be returned as income in the first instance and a deduction allowed later for any amount paid to the Commission. See O. D. 989 (5 C. B. 219) and I. T. 2300 (V–2 C. B. 164). The respondent in a recent decision rendered more than two years after the petitions here under consideration were filed, reversed his two prior rulings and held that it was improper to include in the gross income of the railroads the one-half of the profits in excess of 6 per cent which the railroads were required to pay to the Commission. See G. C. M. 4606 (VII–2 C. B. 256) which is quoted in part as follows:

In view of the foregoing, it seems that the one-half of the net railway operating income in excess of 6 per cent of the value of railway property held for and used in the service of transportation, which is recoverable by and required to be paid to the Interstate Commerce Commission, *never in fact forms a part of the railroad company's gross income. That part of the earnings which is required to be paid over to the Interstate Commerce Commission apparently belongs to the United States at the time it is earned.* * * * It is improper therefore to treat the liability for "recapture" amounts as an ordinary and necessary business expense which is deductible in computing net income, as was held in I. T. 2300 and Office Decision 989. *The proper treatment is to exclude such amounts from gross income.* (Italics ours.)

The statements quoted above are equally applicable to the facts in the instant case. I am, therefore, of the opinion that the respondent erred in including in the income of the partnership of Brown & Adams the amount of $275,345.12 as representing income of the partnership for the taxable year 1918.

LOVE and BLACK agree with this dissent.