THE CENTRAL BANK COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 91299. Filed March 14, 1963.

*Everett H. Davidson, Esq.*, and *Don C. Miller, Esq.*, for the petitioner.

*Eugene S. Linett, Esq.*, for the respondent.

WITHEY, *Judge:* The Commissioner has determined deficiencies in the income tax of the petitioner in the amounts of $18,200, $15,600, and $15,600 for the years 1956, 1957, and 1958, respectively. The sole issue presented is the correctness of the respondent's action in disallowing deductions of $35,000, $30,000, and $30,000 taken by petitioner in its income tax returns for 1956, 1957, and 1958, respectively, as additions to its reserve for bad debts for the respective years.

FINDINGS OF FACT.

We find such facts as the parties have stipulated.

The petitioner is an Ohio corporation organized in February 1895 and since its inception has been engaged in the general banking business. Its principal place of business is in Lorain, Ohio, and its corporation income tax returns for 1956, 1957, and 1958 were filed with the district director of internal revenue in Cleveland, Ohio.

Prior to 1947 the petitioner took deductions for bad debts by the specific chargeoff method. As a result of its examination in 1932 of the condition of petitioner, the Division of Banks of the State of Ohio recommended, *inter alia*, that the petitioner charge off as worthless bad debts the account of Gerald Brown in the amount of $10,010, the account of Leonard Parker in the amount of $489.66, and the accounts of undisclosed others, the amounts or total of which is not disclosed, but the petitioner did not charge off such accounts in 1932.

Following the national bank holiday in 1933 and on April 10 of that year, a conservator was appointed for the petitioner who thereafter controlled the petitioner's operations. Pursuant to a request contained in a resolution of petitioner's board of directors, the superintendent of banks of the State of Ohio took possession of the petitioner on August 25, 1934. In August and September 1934, a plan to enable petitioner to qualify for the insurance of its deposits as provided by the National Banking Act of 1933, or any amendments thereto, and to resume its normal banking operations was proposed, consented to by the superintendent of banks, and approved by the Court of Common Pleas, Lorain County, Ohio.

The plan provided that under its terms the petitioner would resume normal operations with no borrowed money, owning no real estate except the building in which its banking rooms were located, and with no assets deemed ineligible for a sound and liquid operating bank; that the petitioner would resume business with a capital stock of $100,000, a surplus of $20,000, and undivided profits of approximately $10,000; and that in future operations petitioner would retain cash and other sound assets in an amount equal to its liabilities, plus its capital, surplus, and undivided profits. The plan further provided that segregated accounts or deposits, that is, all deposits made in petitioner subsequent to the appointment of a conservator and segregated as required by law, should upon the resumption of normal operations by petitioner, be deemed redeposited in full in commercial accounts in the names of then-present depositors thereof and that nothing contained in the plan should be construed as placing any limitation or restriction on the withdrawal thereof. Respecting desposits made in petitioner which were then restricted under the laws of the State of Ohio or regulations of the U.S. Treasury Department, the plan provided that they should be reduced 45 percent and that upon resumption of normal operations of the petitioner, no provision of the plan should be construed as placing any limitation or restriction on the withdrawal by the depositors of the remaining 55 percent thereof.

In order to effectuate its provisions the plan provided for the formation of an Ohio corporation to be known as the Central Lorain Mortgage Loan Co., sometimes hereinafter referred to as Mortgage Loan Co., for the purpose, among other things, of acquiring, investing in, and selling and generally dealing in mortgages, mortgage notes, and other forms of securities and property, and to which company the petitioner would sell, assign, transfer, and deliver, without recourse,

all of its assets and property which might be found by the superintendent of banks to be ineligible to remain in petitioner. The plan provided that the consideration of such transfer would be the issuance of all the stock of the Mortgage Loan Co. to petitioner or its nominees, plus debenture notes of Mortgage Loan Co. payable to depositors in petitioner in an amount equal to the reduction of restricted deposits in petitioner.

Respecting the debenture notes of Mortgage Loan Co. payable to depositors in the petitioner on account of the reduction of their restricted deposits, the plan provided as follows:

Depositors of the Bank shall receive negotiable Debenture Notes of the Mortgage Loan Company in an amount equal to, and in lieu of forty-five per cent (45%) of their restricted deposits in the Bank (the amount of the reduction therein). Such debenture notes shall be dated as of the date of the Bank's resumption of normal operation, and shall be payable on or before seven (7) years after date, with interest at 2% per annum, payable at maturity. Such debenture notes shall be obligations of the Mortgage Loan Company junior to any obligation created by the Mortgage Loan Company with the Reconstruction Finance Corporation and/or other persons, firms or corporations from whom the Mortgage Loan Company may borrow money as herein provided for, and junior to operating obligations of the Mortgage Loan Company, and shall not be considered as liabilities of the Bank.

Debenture notes will be issued in two classes, namely, Class A Debenture Notes and Class B Debenture Notes. Class A Debenture Notes to be issued to depositors in said Bank having restricted account and holding assets of the bank as security therefor, and, Class B Debenture Notes to be issued to depositors having restricted accounts and not holding assets of the bank as security therefor.

Mortgage Loan Co. was organized on an undisclosed date pursuant to the plan and thereafter the petitioner, pursuant to the plan, submitted the following offer to Mortgage Loan Co.:

We hereby offer to sell to you, and to assign, transfer and deliver to you, in proper form and by proper instruments of assignment and transfer, without recourse, all our right and interest in and to certain property and assets of the undersigned, * * * which assets and securities total as follows:

| | |
|---|---:|
| Mortgage Loans | $205,689.52 |
| Collateral Loans | 16,219.21 |
| Other Loans | 30,622.81 |
| Real Estate | 50,292.65 |
| Bonds and Stocks | 139,612.00 |
| Union Trust Company, Restricted Account | 25,084.66 |
| Guardian Trust Company, Restricted Account | 6,934.06 |
| | 474,454.91 |

The above figures include in each instance the actual present book value of said assets as carried on the books of the undersigned, with all accrued interest included up to the date of transfer.

The consideration for such sale by us and purchase by you shall be:—

1. 250 Shares of the capital stock of your corporation, without par value, to be purchased from the present stockholders of your corporation at the price of $2.00 per share, totaling $500.00 and no more, to the end that we may acquire all of the authorized capital stock of your corporation, the same to be issued and delivered as fully paid and non assessable, plus

2. Debenture Notes of your Corporation in Series A and B. A series to be delivered on waiver of public funds, if any, where the County of Lorain, or other political subdivision thereof, holds securities of The Central Bank Company and on which they have waived all or a part of such deposit. B series to be delivered to our depositors in lieu of and in exchange for the waived 45% portion of restricted deposits in this bank. These debenture notes to be junior pursuant to said plan as amended and contract, to operating expenses, loans, if any, now or hereafter to be made, and all the terms and conditions of said contract in such denominations and payable to such persons, firms or corporations as we may direct, but shall not exceed in the aggregate the total maximum amount of $460,818.62.

After they had fully discussed the offer, the board of directors of Mortgage Loan Co. adopted the following resolutions with respect thereto:

RESOLVED, that the foregoing proposal of The Central Bank Company be and same is hereby accepted, and

That said Assets and securities and real estate, being in our judgment fairly and reasonably worth the several considerations named in said proposal we accept the same in full and complete payment for (1) said 250 shares of the capital stock of this corporation, the same to be issued and delivered as fully paid and non assessable, and (2) the said Debenture Notes, Series A and B of this corporation described in said proposal.

BE IT FURTHER RESOLVED, that the President or Vice President and Secretary or Treasurer of this corporation be, and they are hereby expressly authorized, empowered, directed and instructed to execute all documents, sign all certificates, and deliver all considerations required to complete the acceptance of this proposal, and to do, or cause to be done, any and all things necessary to complete said transfers and carry said proposal into complete effect.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

BE IT FURTHER RESOLVED, that the President or Vice President and Treasurer or Secretary of this corporation be, and they are hereby, expressly authorized, empowered, directed and instructed to complete the execution, signature, delivery and issuance of said Debenture Notes, but that the aggregate total amount of all of said notes shall not exceed the said sum of $460,818.62, mentioned in said Agreement.

Following court approval of the plan on September 14, 1934, the superintendent of banks on the same day and as of the close of business of that day returned to petitioner its business and properties. Pur-

suant to the plan and the petitioner's offer heretofore mentioned to sell, assign, transfer, and deliver to Mortgage Loan Co. certain specified assets totaling $474,454.91 and the acceptance thereof by Mortgage Loan Co., the petitioner transferred such assets to the company and the company's statement of assets and liabilities as of its beginning of business on September 15, 1934, was as follows:

| ASSETS | | LIABILITIES | |
|---|---:|---|---:|
| Cash | $500.00 | Capital | $500.00 |
| Union Trust Company | 25,084.66 | Surplus | 13,636.29 |
| Guardian Trust Company | 6,934.06 | Debenture Notes "A" | 11,000.00 |
| Mortgage Loans | 205,689.52 | Debenture Notes "B" | 449,818.62 |
| Collateral Loans | 16,219.21 | | 474,954.91 |
| Other Loans | 30,622.81 | | |
| Municipal Bonds | 12,771.25 | | |
| Other Bonds & Securities | 81,035.75 | | |
| Foreign Bonds | 45,805.00 | | |
| Other Real Estate | 50,292.65 | | |
| | 474,954.91 | | |

The foregoing assets acquired from petitioner were entered by Mortgage Loan Co. on its books and shown in its foregoing statement of assets and liabilities in the amounts at which they appeared on petitioner's books. In further carrying out the plan the petitioner also transferred to the company as of September 25, 1934, additional assets of the total amount of $17,600 which the company also entered on its books at the amounts at which they appeared on petitioner's books. The total of the above-mentioned $474,454.91 and the $17,600 is $492,054.91, which represents the total book value of all assets transferred by petitioner to the company in pursuance of the plan. Among the above-mentioned assets transferred by petitioner to the company in 1934 were all of the previously mentioned accounts of Gerald Brown, Leonard Parker, and certain undisclosed others which the Division of Banks of the State of Ohio as a result of its examination of the condition of the petitioner in 1932 had recommended be charged off as worthless bad debts but which the petitioner did not charge off in 1932.

Following the above-mentioned transfers in September 1934 of assets by petitioner to it, the Mortgage Loan Co. collected interest from its loans and income from its investments so acquired and never engaged in any activity other than managing such investments and collecting such loans. The amounts received from such activity, after deducting operating expenses, were distributed by the company in payment of the principal of the debentures issued by it. During the

following years the company recovered the following amounts with respects to loans transferred by petitioner to it:

| Year | Recovery |
|------|----------|
| 1934 | $997. 42 |
| 1935 | 13, 253. 74 |
| 1936 | 24, 690. 13 |
| 1937 | 92, 217. 03 |
| 1938 | 7, 647. 96 |
| 1939 | 8, 640. 46 |
| 1940 | 30, 223. 86 |
| 1941 | 20, 369. 16 |
| 1942 | 4, 158. 74 |
| 1943 | 13, 936. 50 |
| 1944 | 14, 055. 11 |
| 1945 | 4, 752. 04 |
| 1946 | 464. 71 |
| 1947 | 1, 500. 00 |
| | 236, 906. 86 |

Mortgage Loan Co. never paid any interest on the debentures issued by it in 1934, as part of the plan to enable petitioner to resume its normal banking operations. Some of the debentures were purchased by Mortgage Loan Co. at various times for amounts less than par and in 1950 the remaining debenture holders were paid the principal balance outstanding on their debentures, without interest, and the company was liquidated and dissolved in that year. Liquidating principal payments were distributed on the following dates and in the indicated percentages of the total amount of the debentures:

| Date | Percent |
|------|---------|
| December 22, 1936 | 10 |
| November 15, 1937 | 10 |
| June 30, 1938 | 10 |
| December 4, 1939 | 10 |
| December 2, 1940 | 10 |
| September 30, 1941 | 10 |
| December 10, 1942 | 10 |
| December 31, 1943 | 7½ |
| December 30, 1944 | 10 |
| December 31, 1946 | 5 |
| December 31, 1949 | 2½ |
| December 31, 1950 | 5 |
| Total | 100 |

The charter of Mortgage Loan Co. was canceled in 1953.

In its income tax returns for each of the years 1928 through 1935, the petitioner took a deduction for bad debts with the exception of the returns for 1931 and 1934 in each of which no deduction was taken for bad debts or for an addition to a reserve for bad debts.

In 1947 respondent granted petitioner permission to adopt the reserve method of accounting for bad debts and in February 1948 advised petitioner that if it desired to change to the reserve method of accounting for bad debts beginning with the year 1947, and to adopt the 20-year moving average of computing bad debt reserves as provided for incorporated banks and trust companies in Mim. 6209, 1947–2 C.B. 26, it might do so. Beginning with its taxable year 1947 or 1948, the petitioner adopted such 20-year moving average of computing its bad debt reserve. Following the issuance of Rev. Rul. 54–148, 1954–1 C.B. 60, supplementing Mim. 6209, which permitted incorporated banks and trust companies to use an average based on any 20 consecutive years after 1927 of the taxpayer's bad-debt experience as an alternative to the 20-year moving average, the petitioner adopted the consecutive 20-year period 1929 through 1948 and continued the use of that period throughout the taxable years here involved. Rev. Rul. 54–597, 1954–2 C.B. 90, supplementing Mim. 6209, subsequently issued, provided that incorporated banks and trust companies using the moving average percentage of bad debt losses to outstanding loans in determining additions to their bad debt reserves as provided in Mim. 6209, or the alternative average experience factor based on any 20 consecutive years of experience after 1927 as provided in Rev. Rul. 54–148 might compute either percentage on the basis of the total net losses for the 20-year period divided by the total outstanding loans for that period, or on the basis of an average of the total percentages computed for each of the 20 years provided that the method of computation adopted be followed consistently.

In its income tax returns for 1956, 1957, and 1958 the petitioner deducted $35,000, $30,000, and $30,000, respectively, as additions to its reserve for bad debts at the end of the respective taxable years. In determining the deficiencies in issue the respondent determined that the balances of the petitioner's reserve for bad debts at the end of 1956, 1957, and 1958, computed in accordance with Rev. Ruls. 54–148 and 54–597, were $140,103.22, $138,847.55, and $138,686.61, respectively; that such amounts of reserve were adequate for the respective years without the additions for which the petitioner had taken deductions; and that accordingly the amounts deducted by petitioner did not constitute allowable deductions under section 166 of the Internal Revenue Code of 1954.

For the purpose of computing the amounts of the deductions taken as additions to its reserve for bad debts for the years in issue, the petitioner used an average bad-debt-experience factor for the 20-year period 1929 through 1948 of .821615 percent. Such average-experience factor as stipulated by the parties was in part based upon an

alleged bad-debt-experience factor for 1934 of 11.0975 percent computed by petitioner as follows:

Assets transferred to Mortgage Loan Company:

| | | |
|---|---:|---:|
| Mortgage loans | $205, 689. 52 | |
| Collateral loans | 16, 219. 21 | |
| Other loans | 30, 622. 81 | |
| | | $252, 531. 54 |
| Other real estate (obtained through foreclosures, etc.) | | [1] 50, 292. 65 |
| Bonds and stocks | | 157, 212. 00 |
| Restricted deposits: | | |
| Union Trust Company | | 25, 084. 66 |
| Guardian Trust Company | | 6, 934. 06 |
| Total assets transferred | | 492, 054. 91 |
| Less: | | |
| Debentures "A" | $11, 000. 00 | |
| Debentures "B" | 449, 818. 62 | |
| | | 460, 818. 62 |
| | | 31, 236. 29 |
| Loans transferred | 252, 531. 54 | |
| | | = 51. 32 percent |
| Total assets transferred | 492, 054. 91 | |
| Loss on transaction attributable to loans: | | |
| 51.32 percent of $31,236.29 | | 16, 031. 46 |
| Net bad debts charged off 12/31/34 | | 2, 237. 05 |
| Total net bad debts 12/31/34 | | 18, 062. 61 |
| Total outstanding loans 12/31/34 | | 162, 762. 52 |

$$1934 \text{ bad debt experience factor} \quad \frac{18,062.61}{162,762.52} = 11.0975 \text{ percent.}$$

[1] Of this amount, assets in the amount of $139,612 were transferred as of Sept. 15, 1934, and assets in the amount of $17,600 were transferred as of Sept. 25, 1934.

In determining the deficiency the respondent determined that the petitioner's net bad debts for 1934 amounted to $2,031.15, which is not in dispute herein, and that its bad-debt-experience factor for that year was 1.2479 percent.

The following is a statement of the petitioner's loans outstanding at yearend, loans charged off, loan recoveries, net bad debts, and other data for the years 1950 through 1960:

| Year | Total FHA loans | Small Business Administration Government Insured portion (70%) | Unearned discount | Hypothecated deposits | Loans charged off as worthless | Loan recoveries | Net bad debts | Total of all loans outstanding |
|---|---|---|---|---|---|---|---|---|
| 1950 | $87,765.46 | $102,224.14 | $39,338.02 | $406,172.08 | $17,007.18 | $2,932.91 | $14,074.27 | $3,251,762.66 |
| 1951 | 120,387.80 | 55,898.07 | 35,156.58 | 434,870.91 | 1,390.58 | 171.00 | 1,219.58 | 3,499,617.04 |
| 1952 | 128,328.94 | 43,104.61 | 54,500.25 | 395,072.86 | ------ | 2,044.15 | [1] (2,044.15) | 3,917,384.07 |
| 1953 | 117,491.69 | 25,434.31 | 80,342.60 | 529,261.86 | 1,323.56 | 9,289.59 | [1] (7,966.03) | 4,672,792.27 |
| 1954 | 289,280.60 | 150,000.00 | 77,121.15 | 625,300.01 | 7,802.71 | 622.81 | 7,179.90 | 5,843,784.00 |
| 1955 | 353,071.26 | 134,209.25 | 81,189.65 | 676,416.80 | 276.47 | 5,464.06 | [1] (5,187.59) | 7,060,241.03 |
| 1956 | 422,139.17 | 108,872.01 | 104,776.21 | 737,580.29 | 188.28 | 641.10 | [1] (502.82) | 8,553,650.42 |
| 1957 | 379,058.21 | 75,773.99 | 139,772.58 | 775,321.11 | 2,661.75 | 470.00 | 2,221.75 | 9,396,818.21 |
| 1958 | 422,805.46 | | 226,538.18 | 851,829.97 | 6,300.02 | 6,139.08 | 160.94 | 11,365,787.92 |
| 1959 | 403,896.67 | 82,956.53 | 342,146.31 | 988,736.87 | 2,514.84 | 2,380.49 | 134.35 | 14,483,154.99 |
| 1960 | 364,441.22 | 75,876.09 | 330,293.47 | 1,384,103.80 | 25,587.29 | 4,222.07 | 21,365.22 | 15,025,072.26 |

[1] Net recovery.

The position taken by petitioner in its assignments of error in its petition, all of which were denied by respondent in his answer, as well as on brief, is substantially as follows: That respondent, by reason of his erroneous omission of large amounts of bad loans experienced by petitioner and other omissions and errors, all contrary to Mim. 6209, Rev. Ruls. 54–148 and 54–597, and section 166 of the 1954 Code, has erroneously computed petitioner's bad-debt-experience factor for the 20-year period 1929 through 1948 to be ".308092% or later recomputed percentages of .286581% or .33113%"; that by reason of such computation the respondent, contrary to law, regulations, and his instructions and bulletins, has erroneously computed petitioner's bad debt reserve for the years in question, has erroneously disallowed the deductions of $35,000, $30,000, and $30,000 taken by petitioner in its income tax returns for 1956, 1957, and 1958, respectively, as additions to its reserve for bad debts for the respective years and thereby has erroneously determined that the petitioner's taxable income for the years in issue exceeded by the foregoing respective amounts the amounts of income actually received by petitioner. In the allegation of facts in its petition on which it relies in support of its assignments of error, the petitioner alleges certain facts, all of which were denied by respondent in his answer, to the effect that instead of the 20-year average bad-debt-experience factor of .821615 percent used by it in computing the amounts deducted by it in the respective years in issue for additions to its reserve for bad debts, it is entitled to use an average bad-debt-experience factor of 9.6343 percent or, in the alternative, a factor of 6.1169 percent.

The respondent takes the position that the petitioner in computing the average bad-debt-experience factor of .821615 percent for the 20-year period 1929 through 1948 used by petitioner in computing the amounts of the deductions taken in its returns for the years in issue as additions to its reserve for bad debts misapplied the formula prescribed in Mim. 6209 and Rev. Rul. 54–148, and if petitioner did not misapply such formula, petitioner has failed to prove that the respondent's disallowance of additions computed thereunder a n d deducted by petitioner in its returns for the respective years in issue was an abuse of the discretion vested in him by section 166(c) of the Code.[1] As to petitioner's allegations of fact that it is entitled to an average bad-debt-experience factor of 9.6343 percent or, in the alter-

---

[1] SEC. 166. BAD DEBTS.

(c) RESERVE FOR BAD DEBTS.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

native, a factor of 6.1169 percent, the respondent takes the position that to arrive at either of such percentages also would require a misapplication of the formula prescribed in Mim. 6209 and Rev. Rul. 54–148 and, even if such misapplication would not be required, the petitioner has not established that respondent's disallowance of the deductions in issue was an abuse of the discretion vested in him by section 166.

By its pleadings as well as in its presentation of the case at the trial and on brief, the petitioner has sought to limit the issue herein merely to the correctness of the respondent's computations in the light of the formula provided in Mim. 6209 and Rev. Ruls. 54–148 and 54–597 supplementing that mimeograph. As was pointed out by the Board of Tax Appeals in *John I. Chipley*, 25 B.T.A. 1103 (1932), the parties usually may narrow the issues as much as they care to but, unless restricted by statute, it would not knowingly decide a case incorrectly upon a full disclosure of the facts.

Respecting the substance of a proceeding, it was said in *Edgar M. Carnrick*, 21 B.T.A. 12, 21 (1930), that:

It is not the Commissioner's method of determination or computation which is the substance of the proceeding, for the deficiency may be correct despite a weakness in arriving at it or explaining it. *Woodside Cotton Mills Co.*, 13 B.T.A. 266; *Jacob F. Brown et al.*, 18 B.T.A. 859. "It is immaterial whether the Commissioner proceeded upon the wrong theory in determining the deficiencies. In any event the burden was on petitioner to show that the assessment was wrong." *Altschul Tobacco Co.* v. *Commissioner*, 42 Fed. (2d) 609.

In view of what has been said above, the basic and ultimate issue here is the correctness of the respondent's action in disallowing the deductions in issue, viewed in the light of the provisions of section 166 of the Code and not viewed in the light of the provisions of Mim. 6209 and subsequent revenue rulings pertaining thereto.

*Foster Frosty Foods, Inc.*, 39 T.C. 772 (1963), involved the respondent's disallowance of a portion of the deductions taken by the taxpayer as additions to its reserve for bad debts for the years 1957 and 1958. In sustaining the respondent we considered section 166 and the provision contained therein for an addition to a reserve for bad debts and said:

Deductions for bad debts are allowed by section 166(a) in the year in which worthlessness occurs, whereas (c), by allowing "a deduction for a reasonable addition to a reserve for bad debts," enables the taxpayer to take the deduction in anticipation of the actual worthlessness and to charge the current losses against the reserve thus created. The word "reasonable" brings a relative, as opposed to a definite, amount into the law. No set formula for computing "a reasonable addition" has ever been fixed by law, the regulations or the Courts. The computation depends upon the circumstances of each case and this is wise though sometimes difficult. * * *

A similar and pertinent view respecting additions that may be made to a reserve for bad debts was expressed in *Black Motor Co.*, 41 B.T.A. 300 (1940), affd. 125 F. 2d 977 (C.A. 6, 1942). In that case the respondent disallowed a portion of a deduction taken by the taxpayer as an addition to its reserve for bad debts for 1936. To support its contention that the entire amount deducted constituted a proper addition to its reserve, the taxpayer relied on a mathematical computation wherein it fixed the percent of losses from bad debts to be applied to its receivables at 40.95 percent in lieu of 32.13 percent used by the respondent in making his determination. There, in sustaining the respondent, it was said:

The test, however, is whether the amount ultimately determined, regardless of formula, constitutes a reasonable addition to petitioner's reserve. What constitutes a reasonable addition will depend upon the facts and circumstances of the business engaged in with relation to general business conditions. A method or formula that produces a reasonable addition to a bad debt reserve in one year, or a series of years, may be entirely out of tune with the circumstances of the year involved. Such, in our opinion, is the situation here, and, in the absence of a showing that the allowance contended for by petitioner is more reasonable than the addition determined by the respondent, the latter amount is approved as a reasonable addition to petitioner's reserve for bad debts.

*Miners National Bank of Wilkes-Barre*, 33 T.C. 42 (1959), involved the respondent's determination of a deficiency in the taxpayer's income tax for 1954. The only question for decision was whether the respondent properly determined that $75,563.04 was a reasonable addition to the petitioner's reserve for bad debts in 1954. The taxpayer had elected to make annual additions to its reserve for bad debts under the 20-year moving formula provided in Mim. 6209. The deficiency there in issue was based on the respondent's determination that the mortgage loans made by banks under title II of the Federal Housing Act were to be eliminated from prior years' accounts in computing percentages of past losses, also from current year's loans in computing allowable deductions for additions to the reserve, because respondent had determined that such title II FHA loans were, for the purposes of paragraph 4, Mim. 6209, to be considered 100-percent Government-guaranteed loans. There it was said:

For some reason the parties have attempted to confine the Court to the very narrow question of whether the Commissioner properly interpreted his own Mim. 6209, 1947–2 C.B. 26, by determining that for the purpose of that mimeograph FHA Title II loans were in fact "100% Government guaranteed loans."

We think this is not proper. Mim. 6209 does not have the effect of law and, certainly, neither do individual rulings under it have the effect of law. The fundamental question still is whether petitioner has proven error in the Commissioner's determination in this case.

Further, in holding for the respondent, it was said:

> We rest our holding, not on the narrow ground of whether or not FHA Title II loans are "100% Government guaranteed," but on the broader ground that petitioner has not shown that the Commissioner in this case unreasonably exercised the discretion vested in him by law.

The petitioner is here contending that in computing its reserve for bad debts and the additions thereto for the years in issue it is entitled to use an alleged bad-debt-experience factor or factors computed by it in accordance with the formula set forth in Mim. 6209 and subsequent revenue rulings relating thereto and based on a bad debt experience covering the 20-year period 1929 through 1948. From what has been said above, it is apparent that because the petitioner may have employed such a formula in computing such factor, that alone is not sufficient to entitle it to employ such bad-debt-experience factor in computing its bad debt reserve and additions thereto for the years in issue. For several of the years included in the period 1929 through 1948 there existed a disastrous nationwide depression which was followed by several years of bad aftereffects therefrom. There also occurred during that period World War II in which the United States was a participant for several years. The petitioner has not shown nor has it attempted to show that the conditions and circumstances with respect to its business through the 20-year period were not "out of tune" with the conditions and circumstances of the years involved here. In fact the petitioner has given us little information respecting the conditions and circumstances of its business during the years in issue.

An exhibit of the petitioner placed in the record by stipulation of the parties discloses that during the 11-year period 1950 through 1960 the total amount of the petitioner's outstanding loans at the yearend increased from approximately $3¼ million at the end of 1950 to approximately $15 million at the end of 1960. During the 11-year period and including the taxable years in issue, the petitioner charged off as worthless, loans totaling $65,032.68 and received loan recoveries totaling $34,377.26. On the basis of the foregoing the average annual amount of loans charged off as worthless was $5,912, the average annual amount of recoveries was $3,125, and the average annual amount of net chargeoffs was approximately $2,787. For the 3-year period in issue, 1956 through 1958, when loans outstanding at the yearend increased from $8,553,650.42 at the end of 1956 to $11,365,782.92 at the end of 1958, the petitioner charged off as worthless loans, totaling $9,130.05, received loan recoveries totaling $7,250.18, resulting in net chargeoffs for the period of $1,879.87, or an average annual net chargeoff of approximately $627. The respondent has determined that the petitioner's reserve for bad debts at the end of 1956, 1957, and 1958 was $140,103.72, $138,847.55, and $138,686.61, respectively.

Those amounts are approximately 50 times the petitioner's average annual net chargeoffs for the 11-year period 1950 through 1960 and more than 220 times the average annual net chargeoffs for the 3 taxable years in issue. In view of the foregoing and the remainder of the record presented, we are unable to find that respondent erred in determining the amount of the petitioner's reserve for bad debts at the end of the years in issue, or in disallowing the deductions taken by petitioner for the respective years as additions to the reserve, or unreasonably exercised the discretion vested in him by law.

In reaching the foregoing conclusion we have considered our holding in *Boardwalk National Bank of Atlantic City*, 34 T.C. 937 (1960), a case relied on herein by petitioner. That case does not have application here because the issue there decided was limited to the question whether petitioner had the right to elect between the moving average 20-year period authorized under Mim. 6209 and any 20-year period as authorized by the later rulings in modification thereof.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

OPPER, *J.*, concurring: All that we are saying here, and have said in such cases as *Miners National Bank of Wilkes-Barre*,[1] seems to me to be that respondent's Mim. 6209 and the subsequent rulings were designed to provide taxpayers with a formula for determining reasonable additions to reserves; and not to authorize an already adequate reserve to be increased to a point where it would become excessive. The latter cannot be so any more than that reasonable guidelines to methods of computing depreciation could authorize such deductions beyond their adequacy to compensate for a taxpayer's basis. See *United States* v. *Ludey*, 274 U.S. 295 (1927).

TIETJENS and DRENNEN, *JJ.*, agree with this concurring opinion.