The Central Bank Company v. Commissioner.
Central Bank Co. v. Commissioner
Docket No. 91299.
United States Tax Court
T.C. Memo 1964-259; 1964 Tax Ct. Memo LEXIS 80; 23 T.C.M. (CCH) 1565; T.C.M. (RIA) 64259; September 30, 1964
Everett H. Davidson, 522 Broadway, Lorain, Ohio, and Don C. Miller, for the petitioner. Eugene S. Linett, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: This proceeding formerly was before us at 39 T.C. 856. It arose from the respondent's determination that the balances of the petitioner's reserve for bad debts at the end of 1956, 1957, and 1958 in the amounts of $140,103.22, $138,847.55, and $138,686.61, respectively, computed in accordance with Rev. Ruls. 54-148, 1954-1 C.B. 60, and 54-597, 1954-2 C.B. 90, which are supplementary to Mim. 6209, 1947-2 C.B. 26, were adequate without additions thereto of the amounts of $35,000, $30,000, and $30,000, respectively, which the petitioner had deducted in its income tax returns for such years as additions to its reserve and that such amounts did not constitute allowable deductions for such years under section 166 of the Internal Revenue Code of 1954. There the petitioner took the position in substance that *82 the respondent, contrary to his regulations, Mim. 6209 and Rev. Ruls. 54-148 and 54-597, and section 166 of the Code, had errneously determined the petitioner's bad-debt-experience factor for the 20-year period 1929 through 1948 to be ".308092% or later recomputed percentages of.286581% or.331113%" and that instead of the 20-year bad-debt-experience factor of.821615 percent used by petitioner in computing the amounts deducted by it in the respective years in issue as additions to its reserve, it was entitled to use a 20-year bad-debt-experience factor of 9.6343 percent or, in the alternative, a 20-year bad-debt-experience factor of 6.1169 percent. The respondent took the position in substance that petitioner in computing the 20-year bad-debt-experience factor of.821615 percent used by petitioner in computing the amounts of the deductions taken in its returns for the years in issue as additions to its reserve misapplied the formula prescribed in Mim. 6209 and Rev. Rul. 54-148 and if petitioner did not misapply such formula, petitioner had failed to prove that the respondent's disallowance of additions computed thereunder and deducted by petitioner in its returns for *83 the respective years in issue was an abuse of the discretion vested in him by section 166(c) of the Code. [1] As to the petitioner's position that it was entitled to a bad-debt-experience factor of 9.6343 percent or, in the alternative, a factor of 6.1169 percent, the respondent took the position that to arrive at either of such percentages also would require a misapplication of the formula prescribed in Mim. 6209 and Rev. Rul. 54-148 and, even if such misapplication would not be required, the petitioner had not established that respondent's disallowance of the deductions in issue was an abuse of the discretion vested in him by section 166. Since the petitioner, by its pleadings as well as in the presentation of the case at the trial and on brief, sought to limit the issue therein merely to the correctness of the respondent's recomputations in the light of the formula provided in Mim. 6209 and Rev. Ruls. 54-148 and 54-597, we *84 pointed out that the basis and ultimate issue presented was the correctness of the respondent's action in disallowing the deductions in issue, viewed in the light of the provisions of section 166 of the Code and not viewed merely in the light of Mim. 6209 and subsequent rulings pertaining thereto, none of which have the effect of law. We further pointed out that because the petitioner may have computed its reserve for bad debts and the additions thereto for the years in issue by the use of an alleged bad-debt-experience factor or factors computed in accordance with the formula set forth in Mim. 6209 and subsequent revenue rulings relating thereto and based on a bad debt experience covering the 20-year period 1929 through 1948, that alone was not sufficient to entitle it to employ such bad-debt-experience factor in computing its bad debt reserve and additions thereto for the years in issue. Also we pointed out the petitioner's failure to show or attempt to show that the conditions and circumstances with respect to its business throughout the 20-year period were not "out of tune" with the conditions and circumstances of the taxable years involved herein. In addition to the foregoing *85 we considered the evidence relating to the petitioner's bad debt experience for the 11-year period 1950 through 1960, which included the taxable years in issue, and pointed out that the petitioner's reserves as determined by the respondent for bad debts at the end of the years in issue were approximately 50 times the petitioner's average annual net chargeoffs for such 11-year period and more than 220 times petitioner's average annual net chargeoffs for the 3 taxable years in issue, 1956 through 1958. In view of the foregoing and the remainder of the record presented, we were unable to find that respondent erred in determining the amount of the petitioner's reserve for bad debts at the end of the years in issue, or in disallowing the deductions taken by petitioner for the respective years as additions to the reserve, or unreasonably exercised the discretion vested in him by law and accordingly entered decision for the respondent. The petitioner appealed our decision to the Court of Appeals for the Sixth Circuit. Prior to the heading of the appeal by that Court the respondent issued Rev. Rul. 63-267, I.R.B. 1963-51, 10, which provided as follows: The Internal Revenue *86 Service has been receiving numerous inquiries as to whether the Service is abandoning the formula set forth in Mimeograph 6092 and Revenue Rulings supplementary thereto in light of the decision of the Tax Court of the United States in Central Bank Company v. Commissioner, 39 T.C. 856 (1963), (on appeal to the United States Court of Appeals for the Sixth Circuit). Section 166(c) of the Internal Revenue Code of 1954[Section 23(k) of the 1939 Code] granted to the Secretary of the Treasury or his delegate discretion to determine what constitutes a reasonable addition to a reserve for bad debts. In connection with the implementation of section 166(c) of the Code with respect to banks, there is set forth in Mimeograph 6209, C.B. 1947-2, 26, and Revenue Rulings supplementary thereto, guide-lines for computing a reasonable addition to a reserve for bad debts. The Service will continue to allow additions to bank bad debt reserves when the additions are determined by the Commissioner to be properly computed in accordance with the formula set forth in the foregoing publications. However, in the case of any bank contending for an addition to its reserve *87 in excess of the amount determined by the Commissioner to be a proper computation in accordance with the formula set forth in Mimeograph 6209, or the Revenue Rulings supplementary thereto, it is the position of the Service that such excess must be shown to meet the reasonable reserve requirements of section 166(c) of the Code. The Central Bank Company decision, rendered in favor of the Commissioner, was based upon the reasonable reserve requirements of section 166(c) of the Code as described above. In view of the issuance of Rev. Rul. 63-267, counsel for the respondent in the Court of Appeals in a supplemental brief and at oral argument to that Court changed his position and abandoned reliance on his contention (1) that the bad debt reserve of the petitioner for the respective years in issue, prior to the yearly additions thereto in controversy, was sufficient and that the additions proposed by petitioner for those years were excessive and unnecessary in the judgment and discretion of the respondent, and (2) that section 166(c) of the Code of 1954 gave the respondent discretion to determine what is "excessive" or "reasonable" concerning such reserve and that the respondent *88 had authority to make such a determination independent of any consideration of what results would be produced by application of the formula provided in Mim. 6209. However, counsel for the respondent urged arfirmance of respondent's determination of the petitioner's bad debt reserve for the respective years solely on the ground that the petitioner had not properly applied the provisions of Mim. 6209 in computing its reserve and allowable additions thereto for those years. In the situation thus before it the Court of Appeals vacated our decision and remanded the case, 329 F. 2d 581 (1964), stating: Since, obviously, this latter issue was not considered by the Tax Court, we remand for its reconsideration and decision in the light of the altered posture of this case set out heretofore. Findings of Fact We incorporate herein by this reference our Findings of Fact set forth in Central Bank Company, 39 T.C. 856 through 864. In addition we make the following findings of fact. In its income tax returns for 1956, 1957, and 1958 the petitioner deducted $35,000, $30,000, and $30,000, respectively, as additions to its reserve for bad debts at the end of the respective *89 taxable years. In explanation of the deductions the petitioner attached to its income tax return for each of the years a schedule entitled "Schedule F - Bad Debts" containing the following statement: In its return for the calendar year 1954, the taxpayer elected to determine its average experience factor for bad debts in accordance with the provisions of Revenue Ruling 54-148. The schedules for the respective years further contained a computation of the deduction taken for the year and a summary of reserve for bad debts both of which are set out in tabular form as follows: Computation of deduction
1956
1957
1958
Qualifying loans, December 31
$8,026,735.04
$8,634,715.48
$10,553,872.52
Experience factor (1929 through
.821615%
.821615%
.821615%
1948)
Tentative addition to reserve
$ 65,948.86
$ 70,944.12
$ 86,712.20
for bad debts
Celling factor (3 times
tentative addition to
reserve for bad debts)
$ 197,846.58
$ 212,832.36
$ 260,136.60
Balance-Reserve for bad debts
December 31
before addition of current
128,103.22
161,847.55
191,686.61
provision
Maximum allowable addition to
reserve for
bad debts
$ 69,743.36
$ 50,984.81
$ 68,449.99
Allowable deduction
$ 65,948.86
Deduction claimed
$ 35,000.00
$ 30,000.00
$ 30,000.00
Summary of Reserve for Bad
Debts
Balance January *
$ 127,600.40
$ 163,103.22
$ 191,847.55
Recoveries
641.10
1,436.08
5,173.00
$ 128,241.50
$ 164,539.30
$ 197,020.55
lLoans charged
off
138.28
2,691.75
5,333.94
$ 128,103.22
$ 161,847.55
$ 191,686.61
Addition for the year *
35,000.00
30,000.00
30,000.00
Balance December 31
$ 163,103.22
$ 191,847.55
$ 221,686.61
*90 The record does not contain any showing as to how the experience factor (1929 through 1948).821615 percent shown in the schedules was computed, except that it was based in part upon an alleged bad-debt-experience factor for 1934 of 11.0975 percent, which in turn was computed as set forth in 39 T.C. 863. The summary of the reserve for bad debts shows a reserve of $127,600.40 on January 1, 1956, the basic or beginning date of the 3-year period. The record does not show how that amount was computed: In the notice of deficiency the respondent's disallowance of the deduction of $35,000 taken by petitioner for 1956 for an addition to its reserve for bad debts at the end of that year was explained as follows: In the income tax return filed on behalf of the corporation for the taxable yead ended December 31, 1956, there was claimed as a deduction on line 20, page 2, Form 1120, an amount of $35,000.00 representing an addition to the reserve for bad debts. It is held that the reserve for bad debt balance at December 31, 1956 in the amount of $140,103.22, *91 computed in accordance with Revenue Rulings 54-148 (1954-1 CB 60) and 54-597 (1954-2 CB 90), is adequate without such addition and the amount claimed, therefore, does not constitute an allowable deduction under section 166 of the Internal Revenue Code of 1954. Identical explanations were given for the respondent's disallowances of the deductions taken for additions to the reserve for 1957 and 1958 except that the deductions taken for those years were $30,000 and $30,000, respectively, and the amounts of the reserves at the end of the respective years determined by respondent were shown as $138,847.55 and $138,686.61, respectively. The respondent's computation of the petitioner's bad debt experience for the 20-year period 1929 through 1948 is as follows: 1
2
3
4 [1]
5
6
Net
Outstanding
Percentage
Year
bad debts
loans
Eliminations
Net loans
(Col. 2 /
Col. 5)
1929
$19,352.33
$ 1,612,882.74
$ 1,612,882.74
1.1999
1930
8,735.31
1,569,684.26
1,569,684.26
.5565
1931
12,818.01
1,227,842.73
1,227,842.73
1,0439
1932
77.03
1,080,896.42
1,080,896.42
.0071
1933
(212.80)
985,310.28
985,310.28
(.0216)
1934
2,031.15
162,762.52
162,762.52
1.2479
1935
2,778.49
162,075.28
162,075.28
1.7143
1936
(3.14)
174,846.53
174,846.53
(.0018)
1937
300,341.38
300,341.38
1938
23.00
398,717.87
$ 91,978.96
306,738.91
.0075
1939
661.63
603,355.35
129,283.12
474,072.23
.1396
1940
551.38
815,895.90
173,243.40
642,652.50
.0858
1941
(170.00)
924,402.38
185,629.22
738,773.16
(.0230)
1942
1,543.98
802,940.26
226,904.98
576,035.28
.2680
1943
862.01
772,290.30
202,819.86
569,470.44
.1514
1944
(732.44)
950,831.37
218,048.95
732,782.42
(.1000)
1945
807.11
1,154,705.42
248,312.02
906,393.40
.0890
1946
433.56
2,136,150.53
390,078.87
1,746,071.66
.0248
1947
111.58
3,238,742.85
471,819.88
2,766,922.97
.0040
1948
6,228.98
3,311,832.91
543,521.42
2,768,311.49
.2250
Total
$55,897.17
$22,386,507.28
$2,881,640.68
$19,504,866.60
6.6183
Average annual percentage 6.6183% / 20
=.308092%.
Alternative percentage (Rev. Rul. 54-597, 1954-2 C.B. 90)
$ 55,897.15
/
$19,504,866
.60
=.286581%
*92 The petitioners' computation of a 20-year average bad-debt-experience factor of 9.6343 percent is as follows: Total
written
Total loan
Net charge
Total loans
Year
off
recoveries
off
year end
1929
$ 22,623.05
$3,270.72
$ 19,352.33
$ 1,612,882.74
1930
8,976.66
241.35
8,735.31
1,569,684.26
1931
13,244.90
426.89
12,818.01
1,227,842.73
1932
80.49
3.46
77.03
1,080,896.42
1933
0
212.80
(212.80)
985,310.28
1934
2,237.05
205.90
304,855.34
162,762.52
302,824.19
1935
2,793.49
15.00
2,778.49
162,075.28
1936
0
3.14
(3.14)
174,846.53
1937
0
0
0
300,341.38
1938
23.00
0
123.00
398,717.87
1939
661.63
0
661.63
603,355.35
1940
557.38
6.00
551.38
815,895.90
1941
0
170.00
(170.00)
924,402.38
1942
1,587.08
43.10
1,543.98
802,940.26
1943
1,211.69
349.68
862.01
772,290.30
1944
340.00
1,072.44
(732.44)
950,831.37
1945
917.11
110.00
807.11
1,154,705.42
1946
950.28
516.72
433.56
2,136,150.53
1947
591.70
480.12
111.58
3,238,742.85
1948
6,953.10
724.12
6,228.98
3,311,832.91
$366,572.80
$7,851.44
$358,721.36
$22,386,507.28
*93 Loans not used
Unearned
Year
FHA
RFC
disc.
Net loans
1929
0
0
0
$ 1,612,882.74
1930
0
0
0
1,569,684.26
1931
0
0
0
1,227,842.73
1932
0
0
0
1,080,896.42
1933
0
0
0
985,310.28
1934
0
0
0
162,762.52
1935
0
0
0
162,075.28
1936
0
0
0
174,846.53
1937
0
0
0
300,341.38
1938
$ 91,978.96
0
0
306,738.91
1939
129,283.12
0
0
474,072.23
1940
173,243.40
0
0
642,652.50
1941
185,629.22
0
0
738,773.16
1942
188,562.19
0
0
614,378.07
1943
175,843.26
0
0
596,447.04
1944
161,140.39
0
0
789,690.98
1945
147,678.51
$ 9,750.00
0
997,276.91
1946
132,303.89
424,388.00
0
1,879,458.64
1947
156,054.45
114,859.62
0
2,967,828.78
1948
123,932.11
145,953.90
0
3,041,946.90
$1,665,649.50
$394,951.52
0
$20,325,906.26
Aver-
Percent to
Total
age
Year
net loans
percent
rate
1929
1.1998
1930
.5565
1931
1.0439
1932
.0071
1933
.0216
1934
187.3621
1935
1,7139
1936
.0001
1937
0
1938
.0075
1939
.1395
1940
.0856
1941
.0230
1942
.2513
1943
.1445
1944
.0927
1945
.0809
1946
.0230
1947
.0037
1948
.02047
192,6866
9.6343
*94 The petitioner's computation of an alternative 20-year average bad-debt-experience factor of 6,1169 percent is as follows: Total
written
Total loan
Net charge
Total loans
Year
off
recoveries
off
year end
1929
$ 22,623.05
$ 3,270.72
$ 19,352.33
$ 1,612.882.74
1930
8,976.66
241.35
8,735.31
1,569.684.26
1931
13,244.90
426.89
12,818.01
1,227,842.73
1932
80.49
3.46
77.03
1,080,896.42
1933
0
212.80
(212.80)
985,310.28
1934
2,237.05
205.90
304,855.34
162,762.52
302,824.19
1935
2,793.49
13,253.74
(10,475.25)
162,075.28
1936
0
24,690.13
(24,693.27)
174,846.53
3.14
1937
0
92,217.03
(92,217.03)
300,341.38
0
1938
23.00
7,647.96
(7,624.96)
398,717.87
0
1939
661.63
8,640.46
(7,978.83)
603,355.35
0
1940
557.38
30,223.86
(29,672.48)
815,895.90
6.00
1941
0
20,369.16
(20,539.16)
924,402.38
170.00
1942
1,587.08
4,158.74
(2,614.76)
802,940.26
43.10
1943
1,211.69
13,936.50
(13,074.49)
772,290.30
349.68
1944
340.00
14,055.11
(14,787.55)
950,831.37
1,072.44
1945
917.11
4,752.04
(3,944.93)
1,154,705.42
110.00
1946
950.28
464.71
(31.15)
2,136,150.53
516.72
1947
591.70
1,500.00
(1,388.42)
3,238,742.85
480.12
1948
6,953.10
724.12
6,228.98
3,311,832.91
$366,572.80
$243,760.88
$122,811.92
$22,386,507.28
*95 Loans not used
Unearned
Year
FHA
RFC
disc.
Net loans
1929
0
0
0
$ 1,612,882.74
1930
0
0
0
1,569,684.26
1931
0
0
0
1,227,842.73
1932
0
0
0
1,080,896.42
1933
0
0
0
985,310.28
1934
0
0
0
162,762.52
1935
0
0
0
162,075.28
1936
0
0
0
174,846.53
1937
0
0
0
300,341.38
1938
$ 91,978.96
0
0
306,738.91
1939
129,283.12
0
0
474,072.23
1940
173,243.40
0
0
642,652.50
1941
185,629.22
0
0
738,773.16
1942
188,562.19
0
0
614,378.07
1943
175,843.26
0
0
596,447.04
1944
161,140.39
0
0
789,690.98
1945
147,678.51
$ 9,750.00
0
997,276.91
1946
132,303.89
124,388.00
0
1,879,458.64
1947
156,054.45
114,859.62
0
2,967,828.78
1948
123,932.11
145,953.90
0
3,041,946.90
$1,665,649.50
$394,951.52
0
$20,325,906.26
Aver-
Percent to
Total
age
Year
net loans
percent
rate
1929
1.1998
1930
.5565
1931
1,0439
1932
.0071
1933
.0216
1934
187.3010
1935
6,4630
1936
14.1227
1937
30.7040
1938
2.4855
1939
1.6828
1940
4,6171
1941
2.7801
1942
.4254
1943
2.1919
1944
1.8725
1945
.3954
1946
.1657
1947
.0467
1948
.2047
122.3386
6.1169
*96 In computing the additions to its reserve for bad debts which it took as deductions in its income tax returns for the taxable years in issue, 1956, 1957, and 1958, and its reserve for bad debts at the end of the respective taxable years, and in computing its 20-year bad-debt-experience factors of 9.6343 percent and 6.1169 percent for the years 1929 through 1948 set out above, the petitioner did not properly apply the provisions of Mim 6209 and the revenue rulings supplementary thereto. Opinion In view of the opinion and mandate of the Court of Appeals for the Sixth Circuit, the limited issue now before us is whether or not the petitioner has properly applied the provisions of Mim. 6209 in computing its reserve for bad debts and the allowable additions thereto for the respective years in issue. As the background and purpose for the issuance thereof, Mim. 6209 provides as follows: 1. The Bureau has given careful and extended consideration to the situation of banks in general with respect to the use of reserves for bad debts, the proper measure of such reserves, and amounts to be allowed as deductions. 2. In determining a reasonable annual addition to a reserve for bad debts *97 by a bank it is believed to be a fair and sufficiently accurate to resort to the average annual bad-debt loss of the bank over a period of 20 years, to include the taxable year, as constituting a representative period in the bank's history and to accept the equivalent percentage of presently outstanding loans as indicative of the probable annual accruing loss. The Tax Court has held that the "use of the reserve for bad debts is not inherently inconsistent with a cash basis where, as here, the reserve is against loss of capital only * * * and contains no element of income which has never been reported. * * * Such a reserve for loss of capital does not differ materially from a reserve for depreciation which is set up on a percentage basis rather than on the basis of actual depreciation suffered." (See Estate of Maurice S. Saltstein v. Commissioner, 46 B.T.A. 774, 777, acquiescence, C.B. 1942-1, 14.) However, such reserve can not be permitted to accumulate indefinitely simply because of the possibility that at some future date large losses may be concentrated within a relatively short period of time and operate to absorb the greatest probable reserve. To permit this would *98 sanction the deduction of a mere contingency reserve for losses, which is not an allowable deduction for income or excess profits tax purposes. This latter rule makes imperative the imposition of some reasonable ceiling on the accumulation of the reserve other than such indefinite limitation as might eventually prevail under a moving average method. Paragraph 3 of Mim 6209 deals with the computation of permissible reserves for bad debts and deductible additions thereto and provides as follows: The Bureau has accordingly approved the use by banks of a moving average experience factor for the determination of the ratio of losses to outstanding loans for taxable years beginning after December 31, 1946. Such a moving average is to be determined on a basis of 20 years, including the taxable year, as representing a sufficiently long period of a bank's experience to constitute a reasonable cycle of good and bad years. The percentage so obtained, applied to loans outstanding at the close of the taxable year, determines the amount of permissible reserve in the case of a bank changing to the reserve method in such year * * * and the minimum reserve which the taxpayer will be entitled to *99 maintain in future years * * *. A bank, following a change to the reserve method of accounting for bad debts, may continue to take deductions from taxable income equal to the current moving average percentage of actual bad debts times the outstanding loans at the close of the year, or an amount sufficient to bring the reserve at the close of the year to the minimum mentioned above, whichever is greater. Such continued deductions will be allowed only in such amounts as will bring the accumulated total at the close of any taxable year to a total not exceeding three times the moving average loss rate applied to outstanding loans * * *. Paragraph 4 relates to the determination of the average percentage of actual bad debt losses to loans and provides as follows: In computing the moving average percentage of actual bad debt losses to loans, the average shall be computed on loans comparable in their nature and risk involved to those outstanding at the close of the current taxable year involved. Government insured loans should be eliminated from prior year accounts in computing percentages of past losses, also from the current year loans in computing allowable deductions for additions *100 to the reserve. Losses not in the nature of bad debts resulting from the ordinary conduct of the present business should also be eliminated in computing percentages of prior losses. Paragraph 6 deals with the treatment to be accorded bad debt losses and recoveries and provides the following: Bad debt losses sustained are to be charged to the reserve, and recoveries made of specific debts which have been previously charged against the reserve by a bank on the reserve method of treating bad debts should be credited to the reserve. Paragraph 8 provides that the term "banks" as used in the mineograph means banks or trust companies incorporated and doing business under the laws of the United States, including laws relating to the District of Columbia, of any state or of any territory, a substantial part of the business of which consists of receiving deposits and making loans and discounts. In our view the foregoing provisions of Mim. 6209 indicate and properly so that in computing thereunder additions to reserve for bad debts only loans in which an element of risk is present are to be considered and that such additions are not to be based on items which never have been reported *101 as income. Rev. Rul. 54-148, which by its terms was applicable to taxable years beginning after December 31, 1953, contains the following: Section 1. Purpose. The purpose of this Revenue Rulling is to supplement Com.-Mimeograph Coll. No. 6209 dated December 8, 1947 (C.B. 1947-2, 26) which authorizes, in the case of banks, a special method for computing a reasonable addition to the reserve for bad debts under section 23(k)(1) of the Internal Revenue Code and the regulations promulgated thereunder. Sec. 2. Background. The Service has carefully reexamined the provisions of Mimeograph 6209, supra, in the light of experience developed thereunder and, as a result of such reexamination, has approved an alternative method for the use of banks in computing the annual addition to the reserve for bad debts and the maximum amount permitted to be accumulated in such reserve, as set forth in section 4 hereunder. * * *
Sec. 4. Alternative Method. .01 In lieu of the moving average experience factor provided in paragraph 3 of Mimeograph 6209, which is determined on a basis of 20 years including the taxable year, a bank may use an average experience *102 factor based on any 20 consecutive years of its own experience after the year 1927. Such average experience factor, representing the percentage of bad debt losses to loans for the period selected, applied to loans outstanding at the close of the taxable year, determines the maximum permissible addition to the reserve for the year. .02 The amounts permitted to be added in each taxable year to the bad debt reserve under (.01) above may not exceed an amount which will bring the accumulated total in the bad debt reserve at the close of the taxable year to a ceiling equal to three times the average experience factor applied to outstanding loans: Provided, 1. That for the first taxable year beginning after December 31, 1953, the amount of the addition therein to the reserve computed under (.01) above may not exceed one-third of the difference between the ceiling so computed and the accumulated total in the reserve at the close of the year before the addition; and 2. That for the second taxable year beginning after December 31, 1953, the amount of the addition therein to the reserve computed under (.01) above may not exceed one-half of the difference between the ceiling so computed *103 and the accumulated total in the reserve at the close of the year before the addition. * * *
.04 The provisions of paragraph 6 of Mimeograph 6209 relating to the treatment of specific bad debt losses and recoveries, and all other rules utilized in the application of Mimeograph 6209 shall, to the extent not inconsistent, be applicable to the alternative method. Sec. 5. Effect on Other Documents. This Revenue Ruling merely supplements Mimeograph 6209 by providing an additional or alternative method for computing the annual addition to a reserve for bad debts and the maximum amount permitted to be accumulated in such reserve. Banks which are now using the moving average method provided in Mimeograph 6209 may continue to use that method if they so desire, and such method is still available to any other banks using or changing to the reserve method of accounting for bad debts. Rev. Rul. 54-597 provides that a bank using the moving average percentage of bad debt losses to outstanding loans in determining additions to its bad debt reserve as provided in Mim 6209, or the alternative average experience factor based on any 20 consecutive years of experience after *104 the year 1927 as provided in Rev. Rul. 54-148, may compute either percentage on the basis of the total net losses for the 20-year period divided by the total outstanding loans for that period, or on the basis of an average of the total percentages computed for each of the 20 years, provided that the method of computation adopted is consistently followed. In 1947 the respondent granted petitioner permission to adopt the reserve method of accounting for bad debts and in February 1948 advised petitioner that if it desired to change to the reserve method of accounting for bad debts beginning with the year 1947 and to adopt the 20-year moving average of computing bad debt reserves as provided for incorporated banks and trust companies in Mim. 6209, it might do so. Beginning with its taxable year 1947 or 1948, the petitioner adopted such 20-year moving average of computing its reserve for bad debts. Following the issuance of Rev. Rul. 54-148 which permitted incorporated banks and trust companies to use an average based on any 20 consecutive years after 1927 of the taxpayer's bad debt experience as an alternative to the 20-year moving average, the petitioner *105 in its income tax return for 1954 adopted the consecutive 20-year period 1929 through 1948 and continued the use of that period throughout the taxable years here involved. The record is silent as to whether under the provisions of Rev. Rul. 54-597 the petitioner elected to compute its average bad-debt-experience factor on the basis of its total net losses for the 20-year period divided by the total outstanding loans for that period, or on the basis of an average of the total percentages computed for each of the 20 years. As we understand the petitioner's position, it here is contending for a computation made on the latter basis. We have set out in our findings, supra, the manner in which the petitioner computed the deductions which it took in its income tax returns for the years in issue as additions to its reserve for bad debts and a summary of its reserves for bad debts for the 3-year period. The summary of the reserve for 1956 shows a reserve of $127,600.40 on January 1, 1956, the basic or beginning date of the 3-year period 1956, 1957, and 1958. However, the record is silent as to how that amount was computed. The computations of the additions to the reserve show *106 that the amounts deducted by petitioner as additions to its reserve for bad debts for the respective years were portions of amounts derived from the application to certain stated amounts shown as qualifying loans of a bad-debt-experience factor of.821615 percent for the 20-year period 1929 through 1948. The record is silent as to how that factor was computed, except that it is shown that it was based in part upon an alleged bad-debt-experience factor for 1934 of 11.0975 percent. In determining the deficiency the respondent determined that the petitioner's net bad debts for 1934 amounted to $2,031.15 and that petitioner's bad-debt-experience factor for that year was 1.2479 percent. With respect to the above-mentioned average bad-debt-experience factor of.821615 percent for the 20-year period and the alleged bad-debt-experience factor of 11.0975 percent for 1934, counsel for the petitioner in their opening statement at the trial stated that after they were employed in the case they determined that such percentages were not applicable and that computations, placed in the record as Exhibits C and D, were made. The computation in Exhibit C shows an average bad-debt-experience factor of *107 9.6343 percent for the 20-year period and a bad-debt-experience factor of 187.3621 percent for 1934 and the computation in Exhibit D, which was submitted as an alternative computation, shows an average experience factor of 6.1169 percent for the 20-year period and an experience factor of 187.3010 percent for 1934. Consequently there are involved here three separate bad-debt-experience factors for the 20-year period and three for the year 1934 computed by petitioner. The principal controversy respecting the petitioner's 20-year bad-debt-experience factor relates to its bad-debt-experience factor for 1934. As stipulated by the parties, the petitioner contends that in addition to bad debts in the amount of $2,031.15 for 1934, which amount is not in dispute, petitioner also in 1934 experienced other bad debts in the following amounts on account of the indicated items: Mortgage loans
$205,689.52
Collateral loans
16,219.21
Other loans
30,622.81
Total loans transferred
$252,531.54
"Real estate representing former
mortgage loans, title to which had
been acquired by foreclosure or
by deed"
50,292.65
Total loans and real estate
$302,824.19
Following the national *108 bank holiday in 1933 and on April 10 of that year, a conservator was appointed for the petitioner who thereafter controlled the petitioner's operations. Pursuant to a request contained in a resolution of the petitioner's board of directors, the Superintendent of Banks of the State of Ohio took possession of the petitioner on August 25, 1934. In August and September 1934, a plan to enable petitioner to qualify for the insurance of its deposits as provided by the National Banking Act of 1933, or any amendment thereto, and to resume its normal banking operations was proposed, consented to by the Superintendent of Banks, and approved by the Court of Common Pleas, Lorain County, Ohio. The plan provided that under its terms the petitioner would resume normal operations with no borrowed money, owning no real estate except the building in which its banking rooms were located, and with no assets deemed ineligible for a sound and liquid operating bank; that after voluntary payment to petitioner by its stockholders of 25 percent of the par value of the stock owned by them, the petitioner would resume business with its same capital stock of $100,000, with a surplus of $20,000, and with undivided *109 profits of approximately $10,000; and that in future operations the petitioner would retain cash and other sound assets in an amount equal to its liabilities plus its capital, surplus, and undivided profits. The plan further provided that all deposits made in petitioner subsequent to the appointment of a conservator and segregated as required by law, should upon the resumption of normal operations by the petitioner, be deemed redeposited in full in commercial accounts in the names of the then-present depositors thereof and that nothing contained in the plan should be construed as placing any limitation or restriction on the withdrawal thereof. Respecting deposits made in petitioner which were then restricted under the laws of the State of Ohio or regulations of the United States Treasury Department, the plan provided that they should be reduced 45 percent and that upon resumption of normal operations of the petitioner, no provision of the plan should be construed as placing any limitation or restriction on the withdrawal by the depositors of the remaining 55 percent. In order to effectuate its provisions the plan provided for the formation of Mortgage Loan Co., an Ohio corporation, *110 for the purpose, among other things, of acquiring, investing in and selling and generally dealing in mortgages, mortgage notes, and other forms of securities and property, and to which company the petitioner would sell, assign, transfer, and deliver, without recourse, all of its assets and property which might be found by the Superintendent of Banks to be ineligible to remain in petitioner. The plan provided that the consideration of such transfer would be, among other things, the issuance by Mortgage Loan Co. of all of its capital stock to the petitioner or petitioner's nominees and the issuance by the company of 7-year, 2 percent interest-bearing negotiable debenture notes, payable to depositors having restricted accounts in the petitioner in an amount equal to and in lieu of the 45 percent reduction of the amount of their restricted deposits in petitioner. The debenture notes were to be solely the obligation of Mortgage Loan Co. Prior to 1947 the petitioner took deductions for bad debts by the specific charge-off method. In each of its returns for the years 1928 through 1935 it took a deduction for bad debts, with the exception of its returns for 1931 and 1934, in each of which *111 no deduction was taken for bad debts or an addition to reserve for bad debts. As set out therein, Mim. 6209 has for its purpose the providing of a method for the computation, by banks electing to use the method, of bad-debt-experience factors which form the bases of the computation of reserves for bad debts and the computation of the statutory allowances for additions thereto. Such being the case and in the absence in the mimeograph of any specific provision relating thereto, it would appear proper that the computation of the bad-debt-experience factor by such method for any given year comprising a part of a 20-year moving period or, as here, a consecutive 20-year period, should be determined within the framework of the various revenue acts and the Code relating to the allowance of deductions for worthless debts and specifically on the basis of the applicable statutory provision governing the allowance of a deduction for bad debts for such given year. Such statutory provisions applicable to petitioner's taxable years 1929 through 1938 provided for the allowance of a deduction for "Debts ascertained to be worthless and charged off within the taxable year." [2] The statutory provision *112 applicable to the taxable years 1939 through 1948 provided for the allowance of a deduction for "Debts which become worthless within the taxable year." [3]
The statutory provision applicable to the petitioner's taxable year 1934 therefore is "Debts ascertained to be worthless and charged off within the taxable year." Under the foregoing provision two acts of the taxpayer are necessary for an allowance of a deduction for bad debts - first, an ascertainment by the taxpayer of the worthlessness of an indebtedness and second, a chargeoff by the taxpayer of the indebtedness so ascertained to be worthless. As heretofore stated the petitioner contends here that in 1934 it experienced bad debts in the total amount of $302,824.19 on account of mortgage loans, collateral loans, other loans and mortgage loans on real estate with respect to which the petitioner had acquired title. From a consideration of all the evidence of record bearing on the question we *113 are unable to find that in 1934 the petitioner or its responsible officials or any governmental officer or agency or court ascertained such indebtedness to be worthless. In our opinion the record not only negatives an ascertainment of worthlessness but definitely shows an ascertainment of substantial value. The plan for enabling petitioner to resume its normal banking operations and the steps taken to effectuate such plan was predicated on the view that the assets of the petitioner which might be found by the Superintendent of Banks to be ineligible to remain in petitioner but which petitioner would "sell, assign, transfer, and deliver," without recourse, to Mortgage Loan Co. taken as a whole had value - substantial, if not considerable. The items composing the $302,824.19 of indebtedness in question represented a portion of the total indebtedness of $474,454.91 which petitioner offered to sell to Mortgage Loan Co. and which the latter agreed to and did acquire, paying therefor 250 shares of its no par value capital stock and its debenture notes in the amount of $460,818.62. E. G. Cooper, a member of the board of directors of Mortgage Loan Co., at a meeting of such board offered *114 and moved the adoption of the resolution which the board adopted accepting the offer of petitioner. That resolution contained a recital that in the judgment of the board the properties included in the offer were "fairly and reasonably worth the several considerations named in said" offer of which were 250 shares of the company's stock and its debentures in an amount not to exceed $460,818.62. In addition to being a director of Mortgage Loan Co., Cooper was a stockholder, the treasurer, and a director of petitioner. In view of the foregoing it is apparent that petitioner's board of directors, which in addition to Cooper included D. H. Aiken, a stockholder and director of petitioner and its president and conservator, as well as the board of directors of Mortgage Loan Co. considered that the $474,454.91 of indebtedness, representing the book value of the indebtedness to petitioner and accrued interest thereon, had a fair and reasonable value of at least $460,818.62, payable in 7 years thereafter with interest at 2 percent per annum payable at the maturity of the debentures, and further considered that as to Mortgage Loan Co. such payments would constitute fair and reasonable obligations *115 for it to assume in order to acquire the ownership of such assets. In the absence of evidence to the contrary, we cannot conclude that the directors of the petitioner and the directors of Mortgage Loan Co., at least some of whom werein a position to be thoroughly familiar with the various items of assets composing the $474,454.91 and the respective values thereof, engaged in mere idle formalities and assigned value to assets which were worthless and known by them to be so. On the other hand, in the absence of evidence to the contrary, we must conclude that the directors were aware of their responsibility and exercised their best judgment based on their knowledge of the assets involved. In our view the record does not establish an ascertainment of worthlessness, but an ascertainment of value for the assets which included those in the amount of $302,824.19 in issue here. To reach any other conclusion would require the conclusion that not only the directors and officers of petitioner and Mortgage Loan Co. but also the Superintendent of Banks of the State of Ohio and the Court of Common Pleas, Lorain County of that state engaged in activities which were merely formal and devoid of substance. *116 The record does not warrant such conclusion. Some of the petitioner's argument is to the effect that the consent of the Superintendent of Banks to and the approval by the Court of Common Pleas of the plan to enable petitioner to resume its normal banking operations and of the steps taken pursuant to the plan to effectuate it constituted in substance orders by the Superintendent and the Court to petitioner to charge off on its books as worthless debts the items and amounts comprising the $302,824.19 here under consideration as well as the other items found by the Superintendent to be ineligible to remain in petitioner. If the Court or the Superintendent issued any order or made any statement having such import, the petitioner has failed to place it in the record. The nearest approach shown by the record respecting a requirement by the Superintendent or the Court as to the treatment to be accorded by petitioner on its books of items of property found by the Superintendent to be ineligible to be retained in petitioner and petitioner's action in response to such requirement is the following recital contained in the minutes of a special meeting of petitioner's board of directors held *117 on September 13, 1934: WHEREAS, said Superintendent of Banks of the State of Ohio, in order to assure that the bank [petitioner] when it resumes normal operation will be sound and sufficiently liquid to obtain insurance of its deposits by the Federal Deposit Insurance Corporation, has prescribed as a condition precedent to the resumption of business by said bank, that assets of the bank, segregated and designated by him, in the aggregate sum of $482,304.91, be charged out of the present assets of the Bank, and disposed of according to the Plan, which said amount is made up as follows, to wit: Mortgage Loans [1]
$205,689.52
Collateral Loans [1]
16,219.21
Other Loans [1]
30,622.81
Investments
139,612.00
Other Real Estate [1]
50,292.65
Union Trust Company
25,084.66
Guardian Trust Company
6,934.06
Liquidation Expense
850.00
Contingent liability Peoples
Savings Bank
7,000.00
$482,304.91
WHEREAS, said chargeouts and deductions have been made in accordance with the directions and instructions of the Superintendent of Banks, and in the following manner to wit: $482,304.91, * * * The plan for reopening the petitioner *118 for normal banking operations stated that one of its primary purposes was upon such reopening to insure to depositors, creditors, and shareholders the future soundness, solvency, and liquidity of petitioner. Under such a standard a sound asset though not presently liquid or readily liquidable would fall in the class of ineligible assets. Furthermore, the plan specifically provided that upon its reopening, the petitioner would own no real estate except the building in which its banking rooms were located. That provision alone rendered all the other real estate of petitioner, regardless of its value, ineligible to be retained in petitioner and required the Superintendent of Banks to so find. Since the plan provided for the sale by petitioner to Mortgage Loan Co. of all of the petitioner's assets and property found by the Superintendent of Banks to be ineligible to remain in petitioner and since such sale was made, we think it apparent that the requirement of the Superintendent mentioned in the minutes of the meeting of petitioner's directors on September 13, 1934, that the assets and property there set forth "be charged out of the present assets of the Bank," was imposed by the Superintendent *119 because the plan required petitioner to convey to Mortgage Loan Co. such assets and property and not because the Superintendent had ascertained or determined that they were worthless. At any rate, the minutes of the directors' meeting contain nothing to indicate that the assets and property were required to "be charged out" or charged off as worthless debts. Further, while the minutes recite that "said chargeouts" and deductions had been made in accordance with the directions and instructions of the Superintendent, they do not indicate that such chargeouts were to consist solely of or were intended to consist solely of worthless debts or other worthless assets or property. Citing G.C.M. 18354, 1937-1 C.B. 79, the petitioner states that, where banks charge off debts in accordance with orders of examiners of the Federal Deposit Insurance Corporation, such chargeoffs are deductible as bad debts. The record is devoid of a showing that any examiner or examiners of the Federal Deposit Insurance Corporation ordered petitioner to charge off either as bad debts or otherwise any or all of the items which Mortgage Loan Co. acquired from petitioner in September 1934. The parties *120 are in agreement that pursuant to the plan for reopening petitioner for normal banking operations the petitioner eliminated and removed from its books the items composing the $302,824.19 in controversy. However, they are in disagreement as to whether the entries effecting such elimination and removal establish that such items were charged off as bad or worthless debts. Pointing to certain entries made on its books on September 15, 1934, and September 25, 1934, the petitioner contends that by such entries it charged off on its books as bad debts the amount of $302,824.19 in controversy. The entries do not contain therein anything to indicate that they were made to charge off worthless debts or other worthless property. Neither the person who made the entries nor the person under whose supervision they were made appeared as a witness to explain the purpose of the entries. However, petitioner offered for that purpose the testimony of Robert S. Latham, a certified public accountant, who, until a few weeks prior to the trial herein, had never been in the employment of the petitioner nor had examined any of its records. The testimony of Latham does not indicate that he had any independent *121 knowledge of the facts and circumstances relating to the petitioner's affairs in 1934 or the purpose for which the entries in question were made. However, his testimony shows that he had made no investigation to ascertain whether any of the items found by the Superintendent of Banks in 1934 to be ineligible to be retained in petitioner were worthless in that year. On cross-examination Latham testified to the effect that the entries relied on by petitioner might equally as well reflect the sale of assets made by petitioner to Mortgage Loan Co. in September 1934 as reflect a chargeoff by petitioner thereof as bad debts. Obviously such testimony does not aid the petitioner here. Where the entries do not show an intent to treat the items involved as worthless debts, the chargeoff requirements of the applicable revenue act have not been met. American Cigar Co. v. Commissioner, 66 F. 2d 425 (C.A. 2, 1933), certiorari denied 290 U.S. 699 (1933), affirming 21 B.T.A. 464 (1930). In view of the foregoing we are unable to find as petitioner contends that the items and amounts composing the $302,824.19 in controversy were charged off on petitioner's books *122 in 1934 as worthless debts or that they became worthless in that or any other year. Since we are unable to find that the indebtedness in the amount of $302,824.19 was ascertained by petitioner in 1934 to be worthless and was charged off by petitioner in that year, we accordingly are unable to find, as petitioner contends, that in 1934 it experienced bad debts in that amount. Consequently we are unable to conclude that petitioner's bad-debt-experience factor for that year was either 11.0975 percent as used by petitioner in computing the deductions taken in its income tax returns for the years in issue as additions to its reserve for bad debts, or 187.3621 percent as computed by it in Exhibit C, or 187.3010 percent as computed by it in Exhibit D, or any other amount greater than 1.2479 percent as determined by respondent. In reaching the foregoing conclusion we have applied the portion of the Revenue Act of 1934 providing for the allowance of a deduction for "Debts ascertained to be worthless and charged off within the taxable year." If the portion of the Code of 1939 applicable to petitioner's taxable years 1939 through 1948 providing for the allowance of a deduction for "Debts *123 which become worthless within the taxable year" be applied, a like conclusion would be required because of the petitioner's failure of proof. For a finding that an indebtedness existing at the beginning of a given taxable year became worthless within the taxable year, it must be shown that it had value at the ebginning of the year and that thereafter during the year something occurred which rendered the indebtedness destitute of value. Denver & Rio Grande Western Railroad Co., 32 T.C. 43 (1959), affd. 279 F. 2d 368 (C.A. 10, 1960); Western Products Co., 28 T.C. 1196 (1957). The petitioner has not submitted any evidence directed to the specific value of the indebtedness of $302,824.19 at the beginning of 1934 nor has it submitted any evidence showing the occurrence during the remaining period of its ownership in 1934 of the indebtedness of any event which rendered the indebtedness destitute of value. The items of loans, accounts, and other assets of petitioner totaling $492,054.91 found by the Superintendent of Banks to be ineligible to be retained in the petitioner were acquired by Mortgage Loan Co. in September 1934 for, among other things, *124 the issuance of its debenture notes in the total amount of $460,818.62. The debenture notes in turn were used by petitioner to pay and discharge an equal amount of its liability on restricted accounts of petitioner's depositors. From the items of loans, accounts, and other assets so acquired, Mortgage Loan Co. recovered during the years 1934 through 1947 the total amount of $236,906.86, approximately $1,000 of which was recovered in 1934, and more than $130,000 of which was recovered in the following 3-year period. The petitioner states on brief that in 1950 it reacquired from Mortgage Loan Co. the latter's remaining and unliquidated assets of an undisclosed character for about $12,000 so that that company could surrender its charter. Adding the $12,000 to the recoveries totaling $236,906.86 made during 1934 through 1947 gives a total of $248,906.86 that Mortgage Loan Co. realized on the assets it acquired from petitioner in September 1934. In view of the foregoing and of the valuations placed on such assets by the directors of petitioner and the directors of Mortgage Loan Co. in September 1934 when the ownership thereof was transferred by petitioner to Mortgage Loan Co., it may *125 fairly be concluded, in the absence of evidence to the contrary, that whatever may have been the value of such assets at the beginning of 1934 they were not destitute of value in September 1934 when transferred by petitioner to Mortgage Loan Co. Since the items totaling $302,824.19 here in issue constituted the major portion of the foregoing assets totaling $492,054.91, we also think it may fairly be concluded, in the absence of evidence to the contrary, that whatever may have been the value at the beginning of 1934 of such items in issue, they were not destitute of value in September 1934 when they were transferred by petitioner to Mortgage Loan Co. In reaching the conclusions set forth above respecting the petitioner's bad-debt-experience factor for 1934, we have also considered the following proposed finding of fact contained in the brief of the petitioner: That the loan charge offs on September 15, 1934, are proper deductions and includable in Petitioner's 20-year computation; except that the $50,292.65, representing about thirteen parcels of real estate should be recomputed and the loss deducted in the year acquired, if the Court determines a prior year should be used, even *126 though Petitioner charged said amounts off on September 15, 1934, pursuant to constituted and supervising authority. In stating its position elsewhere in its brief the petitioner stated that it maintained that the items totaling $302,284.19 were includable in its 20-year bad debt computation for 1934 "with the possible exception of such other real estate which deduction or portion thereof should have been computed and deducted in the year the property was acquired and not entirely in 1934." Respecting the "real estate, representing former mortgage loans, title to which had been acquired by foreclosure or deed, in the amount of $50,292.65," as so described in the stipulation of the parties, the petitioner's witness Latham on direct examination testified to the effect that from his examination of the petitioner's records he was of the opinion that the real estate as such was not an item properly to be included in the $50,292.65 in a determination of petitioner's bad-debt-experience factor for 1934; that approximately 45 percent of the amount of $50,292.65 related to loans on parcels of the real estate, titles to which were acquired by petitioner in 1934, and the remainder related *127 to parcels, title to which was acquired by petitioner in other years (none of which was mentioned by the witness, none of which is disclosed by the record, and all of which may well have been prior to 1929); that only to the extent the fair market values when acquired of the parcels to which petitioner acquired titles in 1934 were less than the costs thereof as shown on petitioner's records, did the petitioner experience bad debts in 1934; and that only to the extent the fair market values of the parcels when acquired, title to which was acquired by petitioner in other years than 1934, were less than the costs thereof as shown on petitioner's records, did the petitioner experience bad debts in such other years. The record is silent as to the fair market value of any of the parcels at or about the time the petitioner acquired title thereto, irrespective of whether title was acquired during 1934 or in another year. Since the record shows only 11 loans and 11 parcels of real estate here involved but does not show when the titles to the various parcels were acquired by petitioner and does not show the fair market value of the respective parcels at or about the time of acquisition of title *128 thereto by petitioner, we obviously are without a factual basis for allocating any portion of the $50,292.65 to any year prior to 1934. Furthermore, it would appear from Latham's testimony that the $50,292.65 is excessive to the extent it was not reduced by the total fair market value of the 11 parcels of real estate at the time petitioner acquired title thereto. As shown by the record, Mortgage Loan Co. was created to and did conduct business not as a division or branch of the petitioner but as a corporate entity independent of and separate and distinct from that of petitioner. The company was not organized for the purpose of engaging in the banking business nor does the record show that at any time throughout its existence it engaged in such business. Consequently its business and affairs are not to be equated as being those of petitioner. Moline Properties v. Commissioner, 319 U.S. 436 (1943); National Investors Corporation v. Hoey, 144 F. 2d 466 (C.A. 2, 1944); Jackson v. Commissioner, 233 F. 2d 289 (C.A. 2, 1956). Accordingly a contention of the petitioner that respondent erred in failing to include in his computation of petitioner's net *129 bad debts for the years 1934 through 1948, respectively, as was done by petitioner in its Exhibit D, the recoveries made by Mortgage Loan Co. during those years on loans, the ownership of which that company acquired from petitioner in September 1934, must be denied. Additionally we find nothing in Mim. 6209 or in revenue rulings supplementary thereto which is susceptible of or which warrants the construction of the mimeograph as contended for by petitioner. As set out in our findings the respondent in column 4 of his computation of the petitioner's bad-debt-experience factors for the taxable years 1938 through 1948 made reductions by way of eliminations of stated amounts from the petitioner's outstanding loans at the end of such years as shown in column 3 with the explanation that such eliminations included unearned discounts, hypothecated loans, and guaranteed portions of FHA and RFC loans. However, the computation does not show a breakdown of the amount of the respective eliminations as between the four items. The petitioner states on brief that it agrees that fully or partially Federal insured loans should be treated in its 20-year computation in accordance with Mim. 6209 and *130 revenue rulings supplementary thereto. Accordingly it does not contest the respondent's above-mentioned eliminations to the extent that they related to FHA and RFC loans. As stated in the stipulation of the parties, there is involved herein the issue of - whether petitioner's "hypothecated deposits" against commodity Loans and "unearned discount" should properly be included in loans outstanding at the close of the taxable year, both for purposes of the 20-year period, and for purposes of additions [to petitioner's reserve for bad debts] for the years in issue. Respecting the foregoing issue to the extent it involves "hypothecated deposits," the parties have stipulated that pursuant to Section 1115.10 of the Ohio Revised Code, copy of which was attached to the stipulation as Exhibit 20, the petitioner maintains on its books and records a consumer loan account and that the "hypothecated deposits" in issue arose by virtue of that account. The foregoing constitutes all of the evidence relating to such deposits. As a consequence we are left uninformed as to the specific terms and conditions of the contracts under which the loans recorded in petitioner's consumer loan account were *131 made. Presumably they conformed, at least in general, to the provisions of Section 1115.10 of the Ohio Revised Code which is as follows: Special Plan Banks. Any bank which is organized and doing business as a special plan bank, and which by the terms of its contract with its depositors provides for the receipt of deposits which are not payable unconditionally upon demand or at a fixed time may, in the case of any loans made in reliance for repayment on the character and earning capacity of the borrower, in addition to discounting interest at the rate allowed by law, require such borrower, as security for such loan, to make periodical deposits in such bank during the period of the loan, with or without an allowance of interest on such deposits, and with or without additional security; and may purchase any obligation payable in installments from the owner thereof, with or without recourse on such owner. Such transactions are not usurious. A special plan bank shall keep only the same reserve as is required of savings banks by section 1105.24 of the Revised Code, and no reserve shall be required against deposits hypothecated to secure indebtedness of the depositor to the bank. A special *132 plan bank may invest its funds, in so far as they are not employed in its ordinary special plan business, as provided in divisions (D) and (E) of section 1105.30 of the Revised Code, and subject to the limitations specified in such divisions. As we construe the foregoing provisions of the Ohio Code, a special plan bank may, in addition to discounting interest at the rate allowed by law, require a borrower, as security for a loan, to make periodical deposits in the bank during the period of the borrower's loan, with or without an allowance of interest on such deposits, and with or without additional security and no reserve shall be required against such deposits hypothecated to secure indebtedness of the depositor to the bank. In view of the foregoing and in the absence of evidence to the contrary, we think it may fairly be concluded that such deposits of the foregoing type as were made with the petitioner and are in issue here, in nowise constituted indebtedness owing to petitioner on loans but merely constituted security to petitioner for repayment of loans. The sums deposited presented no elements of risk to petitioner and are not shown to have represented items of income which *133 had been reported by the petitioner. To include the amount of hypothecated deposits in petitioner's yearend outstanding loans in addition to the inclusion of the amount of the loans themselves would result in an overstatement of the year-end outstanding loans. Accordingly for the purposes of computations under Mim. 6209 such deposits were not properly includable in petitioner's yearend outstanding loans either for the 20-year period or for the taxable years in issue. Cf. Rev. Rul. 63-122, I.R.B. 1963-26, 8. The evidence does not disclose the character or essential nature of the items of "unearned discount" or what that item represented. Consequently we are unable to conclude, as petitioner contends, that respondent erred in excluding the amount of such item from the petitioner's yearend outstanding loans for the 20-year period and for the taxable years in issue. As the record stands it may well be that the item in question constituted "discount which has not yet been realized and reported in gross income for Federal income tax purposes" and in which event, under Rev. Rul. 63-122, supra, is not properly includable in computing the petitioner's 20-year *134 bad-debt-experience factor or for computing the petitioner's year-end outstanding loans for the purpose of computing reasonable annual additions to petitioner's reserve for bad debts under Mim. 6209 and Rev. Rul. 54-148. In view of what has been said above and from a consideration of the entire record bearing on the question we are of the opinion and have so found as a fact that petitioner did not properly apply the provisions of Mim. 6209 and the rulings supplementary thereto in computing the additions to its reserve for bad debts which it deducted in its income tax returns for the years in issue and its reserve for bad debts at the end of such respective years and in computing its 20-year bad-debt-experience factors of 9.6343 percent and 6.1169 percent for the years 1929 through 1948. Since we thus have disposed of adversely to petitioner the limited issue before us under the opinion and mandate of the Court of Appeals for the Sixth Circuit, Decision will be entered for the respondent. Footnotes
1. SEC. 166. BAD DEBTS. (c) Reserve for Bad Debts. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.↩
*. "The Company elects to make an addition to the reserve for loans in an amount less than the maximum allowable deduction."↩
1. Includes unearned discounts, hypothecated loans, and guaranteed portion of F.H.A.'s and R.F.C.'s.↩
2. Sec. 23(j), Revenue Acts 1928 and 1932; sec. 23(k)↩ Revenue Acts 1934, 1936, and 1938. 3. Sec. 23(k) of the Internal Revenue Code of 1939↩ as amended by sec. 124 of the Revenue Act of 1942 and sec. 113 of the Revenue Act of 1943.
1. Here under consideration.↩